CANLFIE1                      Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CRISTINA FIERRO,

4                   Plaintiff,

5            v.                              11 CV 8573 (BSJ)

6   LAWRENCE TAYLOR,

7                   Defendant.

8   ------------------------------x
                                            New York, N.Y.
9                                           October 23, 2012
                                            9:27 a.m.
10
    Before:
11
                        HON. BARBARA S. JONES,
12
                                            District Judge
13                                          and a jury
                            APPEARANCES
14
    CUTI HECKER WANG, LLP
15       Attorneys for Plaintiff
    BY:  MARIANN MEIER WANG
16       ALEXANDER GOLDENBERG
         -and-
17  ALLRED, MAROKO & GOLDBERG
    BY:  NATHAN GOLDBERG
18
    LAW OFFICES OF AIDALA & BERTUNA, P.C.
19       Attorneys for Defendant
    BY:  ARTHUR L. AIDALA
20       OTTAVIO V. MANNARINO
         MARIANNE E. BERTUNA
21
    ALSO PRESENT:
22  Ilene M. Molina, Paralegal

23

24

25

CANLFIE1                          Trial

```
 1            (Case called)

 2            THE COURT:  Good morning.

 3            Let me just explain one thing because I was not clear

 4    when we had our conference last week.  We'll select 14 jurors,

 5    put in the box, and we'll go through the entire questionnaire.

 6    Once we have a fully qualified set of 14 people, then you'll do

 7    your peremptory challenges.  Each side has three challenges,

 8    and we'll end up with eight jurors.

 9            Okay?

10            MR. AIDALA:  Thank you, your Honor.

11            THE COURT:  Are there any other questions about

12    procedure or any particular motions that either party has?

13            MS. WANG:  Your Honor, I have a question.  Based on

14    the emails that we received last late night from defense

15    counsel, I just have a concern.  I did understand on Friday

16    that you were going to be open minded and think about what the

17    proffer was after the plaintiff's direct on her prior sexual

18    history.

19            THE COURT:  Right.

20            MS. WANG:  I did not understand that they could

21    proffer something now and, therefore, mention these things in

22    the opening.  So I just wanted to clarify that.

23            THE COURT:  I don't think Mr. Aidala was intending to

24    mention that in the opening; is that right?

25            MR. AIDALA:  That is correct, your Honor.
```

CANLFIE1                    Trial

1           THE COURT:  Some advance notice for all of us, that's

2    all, and it won't be mentioned in the opening.

3           Mr. Aidala.

4           MR. AIDALA:  May I inquire as to who the first witness

5    will be today?

6           THE COURT:  Sure.

7           MS. WANG:  Your Honor, we intend to call plaintiff

8    first today.

9           THE COURT:  All right.

10          MS. WANG:  And a mechanical question, your Honor,

11   which I could perhaps confer first with Mr. Aidala, but I have

12   two mechanical questions about exhibits.

13          THE COURT:  Go ahead.  Why don't you chat and then you

14   can let me know.

15          MS. WANG:  Your Honor, I did confer with defense

16   counsel, and it's now I just have a mechanical question for

17   your Honor.

18          THE COURT:  Sure.

19          MS. WANG:  I do intend to use some exhibits during

20   Ms. Fierro's direct examination, including a surveillance video

21   that is showing her walking into, being walked into the hotel,

22   to the door of the hotel.

23          Defense counsel has just informed me that he does not

24   object to that.  And so I just wondered if I could forego the

25   move to admit and first show it to her and then publish it to

CANLFIE1                    Trial

1    the jury, if I could just show it to the jury.

2              THE COURT:  Well, no.  I think she should at least say

3    she's looked at it and this is what happened, it's accurate.

4              MS. WANG:  Okay.  So we'll show it to her on her

5    screen.  And I'm just worried about the mechanics of the

6    technology.  So we'll show it first to her on her screen.

7              THE COURT:  If there's no objection, if you wanted to

8    show it, you're going to have to agree with Mr. Aidala what

9    you're going to call it and say now I'm going to show this.

10             You're ready to show it on everyone's screen?

11             MS. WANG:  Yes, your Honor.

12             THE COURT:  All right.  Then that's fine as long as

13   it's all right with Mr. Aidala.

14             MR. AIDALA:  I have no objection, your Honor.

15             MS. WANG:  Thank you, your Honor.

16             THE COURT:  Just make sure the jury knows what you're

17   doing.

18             MS. WANG:  Yes, absolutely.

19             THE COURT:  Anything else?

20             Can you give me, Ms. Wang, an idea of which exhibits

21   you're offering through the plaintiff because I believe that we

22   might be able to deal with some of the evidentiary issues.

23             MS. WANG:  Sure, your Honor, and I will admit that I

24   will probably spend the lunch time maybe curtailing them.

25             But for the moment it's Plaintiff's Exhibit 11.

CANLFIE1                    Trial

1              THE COURT:  So we're not -- I have a whole batch of

2    exhibits from you.  But you're going to give me now at least

3    the ones you're certain of?

4              MS. WANG:  Yeah, I can pull out copies and give them

5    to you.

6              THE COURT:  I have them up here, I think.

7              MS. WANG:  It might be easier, your Honor.  I made

8    copies.

9              THE COURT:  I have it.  Eleven.

10             MS. WANG:  And, your Honor, I'm going to use the

11   redacted version that we sent you.

12             THE COURT:  All right.

13             Mr. Aidala, why don't you take a look at this.  Do you

14   have a copy?

15             MS. WANG:  I'll give everyone a copy now, your Honor.

16             THE COURT:  Don't give them to me because it will be a

17   problem.

18             Just give them to Mr. Aidala.

19             MS. WANG:  Okay.

20             THE COURT:  If I get too much paper up here I'll lose

21   them.  All right.

22             Eleven, just so we have this on the record, these are

23   messages, text messages between the plaintiff and Rasheed

24   Davis.  And this is I think we're all looking at Plaintiff's

25   Exhibit 11 redacted.

1          MR. AIDALA:  Your Honor.

2          THE COURT:  Yes, Mr. Aidala.

3          MR. AIDALA:  If I may be heard.  I know that the

4    plaintiff wants to use the redacted version.  They could put

5    the redacted version in if they'd like, but then I'm going to

6    be putting in the unredacted version because they're all

7    communications between the plaintiff and Rasheed Davis within

8    24 hours of this incident taking place, not 24 days, 24 hours.

9          THE COURT:  I don't know what those are.  Do we have

10   the --

11         MR. MANNARINO:  Yes, your Honor.

12         MS. WANG:  Your Honor, you actually I think should

13   also maybe have the full one because first we provided a full

14   copy.

15         THE COURT:  Okay.

16         MS. WANG:  And, your Honor, I don't know if I'm even

17   going to object.  This is what I want to use.  And if it comes

18   to the point that he wants to use something different, we can

19   visit it then.

20         THE COURT:  I assume you want to use the rest of it

21   for completeness sake?

22         MR. AIDALA:  Yes, your Honor.

23         THE COURT:  All right.  Well, I'll take a look at it

24   and rule on that.

25         You're going to put it in your case, Mr. Aidala?

CANLFIE1                         Trial

1           MR. AIDALA:  I would probably bring it on during

2    cross-examination of the plaintiff.

3           THE COURT:  Okay.  All right.  Well, then, there seems

4    to be no objection other than Mr. Aidala's request that he be

5    able to play the rest of it.  There's no objection to that.

6    And you can use it on cross if you want.  That's fine.

7           MR. AIDALA:  Thank you, your Honor.

8           MS. WANG:  Okay.  But just to be clear, I can use the

9    redacted version.

10          THE COURT:  You're using your redacted version.

11   Absolutely.

12          MS. WANG:  Thank, your Honor.

13          And then, your Honor, I also have photographs, which

14   your Honor has but in black and white, and I selected a smaller

15   group of them.

16          THE COURT:  What's the exhibit number on that?

17          MS. WANG:  It's Exhibit No. 12.  It's of the hotel

18   room.  But if your Honor would like --

19          THE COURT:  I do need to see those.  I haven't ever

20   seen the color, I don't believe.

21          You've seen these, Mr. Aidala?

22          MR. AIDALA:  Have I seen the photographs, yes, I have,

23   your Honor.

24          Your Honor, what I don't believe I have is the exhibit

25   list that you and plaintiff's counsel are referring to.

CANLFIE1                    Trial

1           Thank you.

2           THE COURT:  What's the answer to that?

3           MS. WANG:  It's in the joint pretrial order that we

4      jointly submitted.

5           THE COURT:  Okay.

6           Mr. Aidala, you looked at these?

7           MR. AIDALA:  Have I looked at the photographs, your

8      Honor?

9           THE COURT:  Yes.

10          MR. AIDALA:  Yes, I have.

11          THE COURT:  Any objection?

12          MR. AIDALA:  I have no objection.

13          THE COURT:  All right.  And this will be your

14     Exhibit 12, did you say?

15          MS. WANG:  Yes.  And, your Honor, I was actually going

16     to ask you mechanically, we didn't actually put stickers on our

17     exhibits and I was inclined to mark them, you know, in order

18     that we're actually presenting them as opposed to in the

19     pretrial order.  If your Honor prefers, of course, we will

20     stick to whatever was in the pretrial order.

21          THE COURT:  You know, because I have them all up here

22     with the numbers you had in the order, why don't we stick to

23     that.

24          MS. WANG:  Okay.

25          THE COURT:  Okay.

1          MS. WANG:  Sure.  My only concern is -- whatever is in

2     evidence is in evidence, but that some of them, for example,

3     the photographs, we're not using all of the photographs.  We're

4     only using some.

5          THE COURT:  And you're just going to jot the marking

6     down with a pen, is that the idea?

7          MS. WANG:  Yes.

8          THE COURT:  Just tell me previously exhibit I'm now

9     offering so I know --

10          MS. WANG:  I will definitely do that.

11          THE COURT:  -- what you're referring to.

12          You can do the same, Mr. Aidala.  Your exhibits, are

13     they marked with letters or numbers?

14          MR. MANNARINO:  Numbers, your Honor.

15          THE COURT:  Okay.

16          MR. AIDALA:  Do you want us to change those to

17     letters, Judge?

18          THE COURT:  As you put them in, why don't we do it A,

19     B, C.

20          MR. AIDALA:  Yes, your Honor.

21          THE COURT:  Then we'll know what the defense exhibits

22     are versus the plaintiff's.

23          And if you know I'm already sitting up here with an

24     exhibit marked with a number or something, let me know that

25     that used to be that number so I don't get confused.  All

CANLFIE1                    Trial

1    right.

2            What other exhibits, Ms. Wang?

3            MS. WANG:  Your Honor, we intend to introduce the

4    dress that she wore that evening.

5            MR. AIDALA:  I've never seen that, Judge.

6            I'd just like the record to reflect this is the first

7    time I'm getting notice of seeing the dress.  I don't even know

8    if I'm supposed to be holding it.

9            MS. WANG:  Your Honor, I just want to clarify, we told

10   them once we got the dress and we told them it was available

11   for inspection.  We talked about it.  We put it on the exhibit

12   list.  We had conversations with Ottavio.

13           THE COURT:  It's in the pretrial order?

14           MS. WANG:  Yes, your Honor.

15           MR. AIDALA:  I apologize, Judge.  My fault.

16           THE COURT:  Any objection, Mr. Aidala?

17           MR. AIDALA:  No, your Honor.

18           THE COURT:  All right.

19           MS. WANG:  And then, your Honor, what is Plaintiff's

20   Exhibit 10, which are the photographs of Ms. Fierro which we

21   sent to you in color yesterday.

22           THE COURT:  Yeah, in color?

23           MS. WANG:  Yes.  Yes, your Honor.

24           THE COURT:  Do we have those?

25           Did you send them by messenger?

CANLFIE1                    Trial

1              MS. WANG:  Yes, your Honor.  Actually, our paralegal

2     dropped it off in chambers.

3              THE COURT:  We'll have to go look.

4              MS. WANG:  I have an extra set here.

5              THE COURT:  I can look at those.  We'll try to recover

6     the set you sent us.  I have the black and whites, but I don't

7     have the color.

8              All right.  I have nine photos.

9              MS. WANG:  That's correct, your Honor.

10             THE COURT:  All right.  Mr. Aidala, do you want to

11    take a look at those if you haven't had a chance already.

12             MR. AIDALA:  Yes, your Honor.  I acknowledge having

13    copies of these.

14             THE COURT:  Do you have any objections to any of the

15    photos or the photos themselves?

16             MR. AIDALA:  Well, I would definitely like to voir

17    dire.

18             THE COURT:  I was about to say, it doesn't preclude

19    you from voir diring.

20             MR. AIDALA:  I would like who took the photos, when

21    they were taken, the lighting in which they were taken.

22             THE COURT:  Okay.  But other than that, you'll get --

23    other than what might come out on voir dire, you have no

24    objection?

25             MR. AIDALA:  No, your Honor.

1          THE COURT:  Okay.  Fair enough.

2          What else?

3          MS. WANG:  And then we have the text -- I'm not sure

4    yet whether I will use them with her, but just in case, what's

5    Plaintiff's Exhibit 9, which are her texts with her uncle.

6          THE COURT:  Yeah, I have them.

7          Do you want to take a look at those or perhaps you

8    know what your position is on those texts, Mr. Aidala.  Do you

9    have them?

10          MR. AIDALA:  I'm looking, your Honor.

11          Your Honor, I have the same position on these as well.

12    In other words, I need to voir dire on these text messages.

13          THE COURT:  All right.

14          MR. AIDALA:  Specifically, your Honor, the timing on

15    them is all incorrect because they're forwarded from somebody

16    else.  So it's got to be made clear to the jury that the time

17    that's shown on here is not the time that these messages were

18    received.  That's my understanding.

19          THE COURT:  You're entitled to do that.

20          MS. WANG:  That may be a good reason for me not to use

21    them with this witness.

22          THE COURT:  It may well be.  Exactly.

23          MS. WANG:  And, your Honor, the remaining two exhibits

24    I think are still an issue in limine which are the medical

25    records.  It's Plaintiff's Exhibit 18, which are the medical

CANLFIE1                    Trial

1    records from the night.

2            THE COURT:  Right.  And the other would be 19, the

3    psychiatry record?

4            MS. WANG:  That's correct, your Honor.

5            THE COURT:  You're not bringing in a doctor or

6    psychiatrist?

7            MS. WANG:  No, your Honor.

8            THE COURT:  Okay.  Well, I do have some problems with

9    portions of these.  Did you intend to put them in whole or are

10   there parts you want to admit?  It would help me a great deal

11   if you told me exactly which portions you wanted to admit.

12           MS. WANG:  To be honest, your Honor, I don't --

13           THE COURT:  Let me put it this way.  There are

14   certainly portions here that I don't think are admissible.  And

15   so maybe you could take some time and narrow the field.

16           MS. WANG:  Okay, your Honor.  I might ask if I could

17   take the lunch hour to look at that --

18           THE COURT:  Sure.

19           MS. WANG:  -- and consider it.  My instinct, my first

20   reaction is that probably we would want the sexual assault

21   examination pages.

22           THE COURT:  All right.  I'll let you tell me exactly

23   what you want after you've had a chance.

24           There are records here that without somebody to

25   interpret them -- and I don't mean interpret them in terms of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CANLFIE1                    Trial

1   what they mean medically or psychiatrically.  I can't even read

2   the handwriting in some instances.  And I also don't believe in

3   giving the jury a lot of paper that we haven't actually

4   highlighted for them and put into the context of the case.

5        So I would like these winnowed down to what you really

6   want to proffer, and then I will have an argument with respect

7   to whether or not they can come in.

8        Now, preliminary to all that, I am under the

9   understanding that there's no objections by either party to the

10   authenticity of the records?

11        MR. AIDALA:  That's correct, your Honor.

12        THE COURT:  Do you have a general or any other

13   arguments with respect to these generally?  We don't know yet

14   exactly what the plaintiff is going to proffer from them.

15        Mr. Aidala, I'm sorry.

16        MR. AIDALA:  That's okay.  Yes, your Honor, I mean we

17   don't know who recorded what's written there.  We don't know

18   when it was recorded.  We don't know how many other patients

19   were seen between the time they saw Ms. Fierro and the time

20   they actually wrote those things down.  We don't know the areas

21   of expertise that that individual that recorded had, how many

22   years of experience that individual had, how many years of

23   experience dealing with these types of injuries that this

24   individual had.

25        So there's so many open-ended questions that somebody

CANLFIE1                    Trial

1   who actually created the document would be able to answer as

2   opposed to us just guessing.

3             THE COURT:  Right.  Okay.  I'll tell you what.  We'll

4   have this argument, no doubt.  So these won't be offered until

5   after the plaintiff has an opportunity to go through them and

6   figure out exactly what they want to offer.  That will narrow

7   our argument.  And before they're offered, I will have ruled on

8   whether they're admissible or not.

9             But I take your argument.  I understand.

10            MR. AIDALA:  Thank you, your Honor.

11            THE COURT:  And you'll have an opportunity to make a

12  full argument once we know what we're dealing with.

13            Anything else from the plaintiff during her direct?

14            MS. WANG:  I don't believe so, your Honor.

15            THE COURT:  All right.  Then unless there are any

16  other issues specifically that anyone wants to raise, we could

17  take a break and wait for the jury.

18            But, Mr. Aidala, you have one.

19            MR. AIDALA:  Just very briefly, your Honor.  Just I

20  took an idea from Mr. Goldenberg over the weekend, I may show

21  plaintiff a Google map just showing where.

22            THE COURT:  I guess there would be no objection to

23  that.  You mean on cross-examination?

24            MR. AIDALA:  Yeah, I just want to let everybody know.

25            Thank you, your Honor.  Nothing further.

CANLFIE1                          Trial

1          THE COURT:  I think with respect to the Google map, it

2     was left that you could certainly show it to plaintiff and use

3     it in her direct.  If I didn't say that, I'm saying it now from

4     the last conference, and I'm speaking to the plaintiff now.

5          MS. WANG:  Yes.

6          THE COURT:  Anything else?

7          MS. WANG:  Just, your Honor, just for completeness,

8     when we sent the package by hand yesterday, it included both

9     the color photographs and a stack of impeachment materials

10    because I understood your Honor wanted them in advance of my

11    cross-examination of Mr. Taylor.  So I just wanted to clarify

12    that we had sent it.  So if you don't have the package to

13    please let us know.

14         THE COURT:  We don't have -- it didn't come with our

15    mail.  I don't know where your messenger specifically --

16         MS. WANG:  My understanding is she went up to

17    chambers.

18         THE COURT:  It's in our mail room.  We'll try to find

19    it.  It could show up this morning in the mail.

20         Anything else?

21         MR. AIDALA:  No, your Honor.

22         THE COURT:  All right.

23         The jury is not going to be here until 10:15.

24         MR. AIDALA:  Thank you, your Honor.

25         (Pause)

CANLFIE1                      Trial

1              THE COURT:  It's not the custom to actually transcribe

2     the voir dire in our civil cases.  If both parties want it

3     transcribed, that's fine, but we don't normally do it.  So it's

4     up to you.  Please let the reporter know what you decide.

5              MS. WANG:  Thank you.

6              (Jury voir dire held off the record)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAN5fie2

1          (A jury of eight was impanelled and sworn).

2          THE COURT:  Ladies and gentlemen, as I just said, you

3     are the jury in this case now and we are going to take a break

4     for lunch.  I would ask each of you to come back and Bill will

5     take you into the jury room as you leave now so that you see

6     where it is, he will give you a few quick instructions, and I

7     would like you to be back in the jury room and ready for the

8     beginning of the trial for 2:00.

9          Please, do not discuss the case among yourselves,

10    don't let anybody talk to you about the case.  You are not

11    supposed to speak with the parties.  They know they're not

12    supposed to speak with you.  If you see anybody in the hallway

13    and they don't say "Hello," they won't say "Hello" to you.

14    These are my rules, they're not being impolite.

15         Don't discuss the case, you don't know what any of the

16    facts are yet.

17         I will see you back here at 2:00.  I will give you

18    preliminary instructions about the case and then we will begin

19    with opening statements.

20         Bill?

21         THE DEPUTY CLERK:  Ladies and gentlemen in the back,

22    you are discharged.  Go back to 160.

23         Can I see counsel in the robing room briefly?

24         (Discussion off record)

25

CAN5fie2

```
1                    A F T E R N O O N   S E S S I O N

2                               2:10 p.m.

3            THE COURT:  Bill, will you bring in the jury?

4            THE DEPUTY CLERK:  Marshal, bring in the jury, please.

5            (Jury present)

6            THE COURT:  All right, ladies and gentlemen.  Before
```

we have the opening statements of counsel I want to give you

just a few preliminary instructions which I hope will help you

understand what is going on as we proceed.

        As you know, you are the jurors in this case now and

it is going to be your duty to find from the evidence what the

facts are.  You are the judges of the facts.  You will then

have to apply to those facts to the law as I will give you to

you at the end of the trial, and you have to follow that law

whether you agree with it or not.

        Now, please remember, nothing that I may say or do

during the course of the trial is intended to indicate nor

should be taken by you as indicating what your verdict should

be.

        Now, the evidence from which you will find the facts

will consist of the testimony of witnesses from that witness

stand, documents and other exhibits that are received into the

record, and any facts that the lawyers may decide to agree on

or, as we say, stipulate to, or that I may instruct you to

find.

CAN5fie2

1          Now, there are two kinds of evidence; there is direct

2     and circumstantial.  Direct evidence is direct proof of a fact

3     which basically a good example would be the testimony of an eye

4     witness who actually saw something.

5          Circumstantial evidence is proof of a number of facts

6     from which, when you put them together, you may infer or

7     conclude that some other fact exists.  And I will give you

8     further instructions on these as well as other matters at the

9     end of the case.  But, keep in mind that you may consider both

10    kinds of evidence, direct and circumstantial.

11         Now you, the jurors, are the sole judges of

12    credibility and truthfulness of any witness and it is going to

13    be up to you to decide which witnesses to believe, which

14    witnesses not to believe, and how much of any witness'

15    testimony to accept or reject.  I will give you some guidelines

16    which I hope will help you to determine the credibility of the

17    witnesses, again at the end of the case.

18         Now, certain things are not evidence and I just want

19    to go through those with you because you must not consider them

20    in your deliberations.

21         First of all, the statements, the arguments, and the

22    questions by the lawyers aren't evidence.

23         Secondly, objections that may be made to questions are

24    not evidence.  And just remember that the lawyers have an

25    obligation to their client to make an objection when they

CAN5fie2

1    believe that evidence being offered is improper under the rules

2    of evidence.  So, don't be influenced by the objection or by my

3    ruling on it.  If I sustain the objection then you just ignore

4    the question, there won't be an answer.  If I overrule the

5    objection there will be an answer and you should treat it like

6    any other answer in the case.

7         If at some point I instruct you that some other item

8    of evidence or testimony is received for a limited purpose

9    only, obviously you have to follow that instruction as you

10   follow, I hope, all of my instructions.  Don't worry about that

11   now.  When it happens, if it happens in this case and I give

12   you that type of instruction, I will try to be as clear as

13   possible.  I may exclude some testimony or tell you to

14   disregard it and that means it's not evidence and you should

15   not consider it.

16        Lastly, anything that you may see or hear or may have

17   seen or heard outside the courtroom is not evidence and has to

18   be disregarded.  You have to decide this case solely on the

19   evidence presented here in this court.

20        Now, as you know, this is a civil case so the concept

21   of guilt beyond a reasonable doubt doesn't apply here.  You

22   should put it out of your minds.  Rather, the plaintiff will be

23   required to prove her case by a preponderance of the evidence.

24   This burden is always on the plaintiff and does not shift to

25   the defendant and I will give you more instructions on this

CAN5fie2

1    concept of preponderance of the evidence again in my

2    instructions at the end of the case.

3            Just a few words about your conduct as jurors:

4            During the trial you are not to discuss the case among

5    yourselves or with anyone else until you have heard all of the

6    evidence, I have instructed you on the law, and then I send you

7    in for your deliberations.

8            Now, this rule about not discussing the case with

9    others includes discussions with members of your family or

10   friends or really anyone.  The rule also applies to electronic

11   communications about the case.  That is, you must not

12   communicate with anyone including fellow jurors about the case

13   in any form -- in person, on the telephone, through e-mail,

14   through text messages, twitter, Facebook, any other media.  You

15   may not update your status on any website to tell anyone that

16   you are a juror on trial or to give any information about the

17   trial at all while the trial is ongoing.

18           Now, until you retire to the jury room at the end of

19   the case to deliberate on your verdict you simply are not to

20   talk about the case.  If at any time during the course of the

21   trial -- and I don't expect this to happen, any person attempts

22   to speak or communicate with you about the case in or out of

23   the court house, you should immediately report that to me.

24           Now, in this connection -- and I have already

25   mentioned this to you but I will say it again -- I should

CAN5fie2

1   explain that the attorneys and the parties in this case may not

2   talk to you, even to offer a friendly greeting, to wave hello.

3   So, if you happen to see any of them outside this courtroom,

4   they will and should ignore you.  Please don't take offense,

5   they're only following my instructions and they're acting

6   properly.

7          In addition, please do not try to conduct any

8   independent research about the case on your own.  In other

9   words, you should not search the internet, websites, blogs or

10  to use any other electronic tools or reference materials to

11  obtain information about this case or to help you decide the

12  case.  You may not search for or look at profiles of any of the

13  people in the case on any social media, website.  You must not

14  try to find out information from any source outside of this

15  courtroom.

16         And finally, this is the reason why we also ask you

17  not to speak to each other or anyone else about the case, we

18  don't want you, and I am instructing you to not form any

19  opinion until all the evidence has been presented to you.

20  Please keep an open mind until you start your deliberations at

21  the end of the case.

22         Now, just a quick word about how the trial will

23  progress.  First the plaintiff's attorney will make an opening

24  statement which is simply an outline to help you understand the

25  evidence as it is presented.  Then the defendant's attorney

CAN5fie2

1    will make an opening statement and please remember that these

2    opening statements are not evidence.

3          Counsel for the plaintiff will then present her

4    witnesses and counsel for the defendant may cross-examine them.

5    Following the plaintiff's case the defendant may present but

6    doesn't have to present a case, and the plaintiff will have the

7    opportunity to cross any witnesses testifying for the

8    defendant.

9          After all the evidence is in the plaintiff and the

10   defendant's attorneys will present their closing arguments to

11   you and these are meant to summarize the evidence and to

12   interpret it for you.  Following these arguments -- and again,

13   they're arguments, not evidence -- the Court will instruct you

14   on the law.  After that you will retire to deliberate on your

15   verdict which will be based on the evidence before you.

16          All right.  Thanks for your attention and now we will

17   begin this trial with the plaintiff's opening statement.

18          MS. WANG:  Thank you, your Honor.  Your Honor, do you

19   mind if I walk a little bit or do you want me to stand?

20          THE COURT:  As long as I can hear you and everyone

21   else, that is fine.

22          MS. WANG:  Good afternoon.  In the early morning hours

23   of May 16th, 2010, Lawrence Taylor forced himself on a teenage

24   girl, a 16-year-old girl named Cristina Fierro, even though she

25   turned her back, even though she said she was uncomfortable,

1    even though she pushed him off.

2         Ms. Fierro did not consent to having sex with Lawrence

3    Taylor and he knew that.  This case is about a famous man who

4    forced himself, who sexually assaulted a teenage girl and then

5    lied and laughed about it afterwards.

6         Good afternoon, again.  I just want to say my name is

7    Mariann Wang and I represent Cristina Fierro at the end of that

8    table, and on her behalf I want to start by thanking you for

9    your service and for your attentiveness over the next few days.

10   This is the one and only chance Cristina Fierro has to prove

11   her case that she was sexually assaulted by Lawrence Taylor.

12        So let me start by telling you a little bit about

13   Ms. Fierro.

14        She is now 19 old.  She was born in New York City and

15   lived -- from age 3 to about 14 she lived in Pennsylvania.  She

16   has not had the easiest life.  Her father was never really in

17   her life.  Her mother, at the age of 14, was sent to prison,

18   and for the next two and a half or so years Ms. Fierro didn't

19   really have one home.  She moved around a lot and she was --

20   the evidence will show that she was in about nine different

21   places over the course of those two and a half years.

22        Ms. Fierro is not a perfect person.  None of us are.

23   But, on the evening of May 5th to 6th, 2010 she did not consent

24   to having sex with Lawrence Taylor.  So, let's turn to what the

25   evidence will show about what happened that night.

1          First of all, how did Ms. Fierro end up in a room with

2    Lawrence Taylor?

3          The evidence will show that a man named Rasheed Davis

4    delivered her directly to the door of room 116 where Lawrence

5    Taylor was.  The evidence will show that Ms. Fierro had met

6    Rasheed Davis approximately a month and a half or two months

7    before in March 2010, and Davis used all of the typical

8    predatory tactics that predators use.  He was at first very

9    nice to this 16-year-old girl.  He showed her money, he drove

10   her around in his fancy car, his white Mercedes.  He paid

11   attention to her -- something that others weren't doing -- and

12   he brought her to a car show out -- a car show, something she

13   had never seen before.  But, there was a price to it.  He gave

14   her ecstasy pills, he brought her to after hour bars where he

15   had her put on lingerie and sit at the bar and talk with men or

16   dance.  The evidence will show that Rasheed Davis wanted her to

17   do more:  He wanted her to sell her body for sex -- for money.

18   He wanted her to have sex for money but the evidence will show

19   that Ms. Fierro said no over and over again.  She was not a

20   prostitute.

21         Late in the evening of May 5, 2010 Rasheed Davis would

22   not take no for an answer.  He punched her in the face, he

23   kicked her, he stomped on her as she curled up on the floor and

24   he told her you are going to go have sex tonight for $300.

25         The evidence will show that she had -- as a result of

1   that beating she had a bruised eye and a bloody nose and that

2   after that happened Rasheed Davis made her put on a dress that

3   she had never seen before and he had her get in his car and he

4   started driving her.  She didn't know where she was going, she

5   just knew that she was being taken and that he was going to

6   force her to have sex for money.  She tried desperately during

7   this car ride to reach out for help.  After calming herself

8   down -- she was sobbing -- she finally got her phone back

9   because it kept ringing from Rasheed Davis, and she reached out

10  and called her uncle.  She spoke in Spanish because she knew

11  that Davis couldn't understand Spanish and she called her uncle

12  for help but she didn't know where she was.  She was 16, she

13  had no idea where she was driving.  The car ride took about an

14  hour, an hour and a half, and finally when the car stopped she

15  saw that she was at a Holiday Inn.  Rasheed Davis got out of

16  the car, opened the car door and walked Ms. Fierro from the car

17  right up to the door of room 116 in the Holiday Inn.  He told

18  her to repeat after him again and again:  My name is Carmen,

19  I'm 19.  He made her repeat it, and then he said don't screw

20  this up.

21          Ms. Fierro is 16 years old.  He's waiting for her to

22  go into that room and so she does, she goes into that room.

23  She entered that room bruised, she entered that room scared,

24  she entered that room frightened and what did she see?  She saw

25  a man on the bed, a very huge, large man who opened the covers

CAN5fie2                    Opening - Ms. Wang

1    to show that he was naked and that he was waiting for her.

2    That man was Lawrence Taylor.  She didn't know who Lawrence

3    Taylor was, she never heard of him, she's 16 years old, but she

4    did know that he was waiting for her and expecting her; she

5    knew that because the door to the room had been propped open

6    and because he didn't say:  *What are you doing here?*  He just

7    pulled off the covers to show that he was waiting for her.  And

8    so what did Ms. Fierro do?  Again, she's scared.  Outside is

9    Rasheed Davis, inside is this enormous man.  She still tries

10   desperately one more time to get help and she manages briefly

11   to go outside and make another phone call, again talks to her

12   uncle.  She tries to call 911.  She dials 911, puts the phone

13   in her purse.  Why does she go back into the room?  She tried

14   to reach 911.  The cell phone reception was bad and the call

15   dropped and she's also between a rock and a hard place, Rasheed

16   Davis said he was waiting right down the hall.

17           So, she goes back in and she sees this man and I want

18   you, for a moment, to just think about what that means.  He

19   is -- the evidence will show that this man is 6'3" and a half

20   and he's 260 pounds at that time and the evidence will also

21   show that Ms. Fierro, a 16-year-old at that point -- she hadn't

22   finished growing yet -- she was 5'5" and 110 pounds.  That man

23   is almost a foot taller than her, 150 pounds heavier than her.

24           But, she went back in.  And her face is plainly

25   bruised and by Lawrence Taylor's own testimony he turned on the

CAN5fie2                    Opening - Ms. Wang

1    light to take a look at her.  He also asked her how old she

2    was.  Frightened, she said exactly what she knew he wanted to

3    hear, she said she was 19 years old.

4            Taylor at first just talked and Ms. Fierro hoped that

5    maybe it would be able to just be talk.  At some point she

6    turned and gave him her back.  She thought she told him she was

7    uncomfortable, she told him this was her first time.  She had a

8    bruise on her face, she thought she knew that he knew but the

9    nightmare was not over because the evidence will show that

10   Mr. Taylor started to touch her, started to massage her, and

11   it's not very pleasant to have to talk about these things in

12   this courtroom.  It is not something I actually want to be

13   talking about but you have to hear what happened in the room.

14           Lawrence Taylor started to lick her, he started to

15   perform oral sex on her, and by Lawrence Taylor's own

16   testimony, she said no, no, no.  Lawrence Taylor put on a

17   condom and put his penis inside her vagina and she tried to

18   squirm away and she tried to push him off.  She's 110 pounds,

19   he's 260, he's a retired professional football player, he is a

20   linebacker.  She had no strength but she pushed, and he knew

21   and he pushed back because Lawrence Taylor needed to satisfy

22   himself and that's exactly what Lawrence Taylor did.

23           The sworn testimony will then show that after that

24   Lawrence Taylor handed her $300 without anyone talking about

25   money and told her to turn the TV off on the way out.  The

1    evidence will show that she walked slowly, shakily, back to

2    Rasheed Davis and gave Rasheed Davis the $300 and that Rasheed

3    Davis then drove her back to the Bronx from Rockland County.

4    The evidence will show that the Holiday Inn was in Rockland

5    County.

6           During that car ride, again Ms. Fierro, she had

7    realized at one point that the phone had dropped the call

8    reception and that now she needed to get help and again, during

9    that car ride back, she reached out for help.  She texted her

10   uncle, her uncle called the police and the police responded and

11   you will hear from the police -- one of the police officers who

12   responded to the scene and you will hear his testimony about

13   what she looked like when she got out of that car.

14          And you will hear evidence about how Ms. Fierro then

15   went to the hospital and was given a rape kit and you will ---

16          MR. AIDALA:  Objection, your Honor.  I thought the

17   Court ruled that was going to be inadmissible.

18          THE COURT:  Overruled.

19          MS. WANG:  You will also hear about how her sister

20   came to visit her at the hospital and you will hear testimony

21   and evidence about how this is all devastated Ms. Fierro.

22          Now, that's some of the evidence and the support for

23   Ms. Fierro's statement of how she was forced to have sex

24   against her will and how Lawrence Taylor knew that.  Let's turn

25   for a moment to what the defendants will say about this.

1          Defendant, of course, will come here and tell you a

2     completely different story.  We expect Lawrence Taylor to take

3     the stand.  We expect him to testify with self-assurance and

4     professionally.  He has a lot of experience being interviewed

5     on television.  And, I also expect that in a few moments you

6     will hear from his lawyer, Mr. Aidala, who will tell you that

7     Ms. Fierro is not to be believed.  He will tell you that she

8     has been inconsistent in her reports over the years.  And he

9     will tell you that even if you think what has happened to her

10    before she went into that room was tragic that Lawrence Taylor

11    didn't know what happened to her before.

12          THE COURT:  Ms. Wang, this really should be about what

13    you intend to prove.

14          MS. WANG:  Of course.

15          But the evidence will show that this case is about

16    Lawrence Taylor sexually assaulting Ms. Fierro and the evidence

17    will show that Lawrence Taylor has had many different versions

18    and stories to tell about what happened that night.  The

19    evidence will show that the morning that he, after this all

20    happened, he told the police that he did not have sex with that

21    girl.  But he didn't just tell the police, he made sure to tell

22    the world.  His lawyer --

23          MR. AIDALA:  Objection, your Honor.

24          THE COURT:  Do we need a side bar on this?

25          MS. WANG:  Yes, your Honor.  I think so.

CAN5fie2                         Opening – Ms. Wang

1          THE COURT:  All right.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAN5fie2                          Opening – Ms. Wang

1          (At side bar)

2          THE COURT:  Ms. Wang, what is it?

3          MS. WANG:  I want to say that Mr. Aidala held a press

4   conference right after the Court appearance and said my client

5   didn't have sex with anybody period, amen.  And that's the

6   statement of an agent; it is an admission.

7          THE COURT:  You have already told them that Lawrence

8   Taylor denied it.

9          MS. WANG:  But it is important that it was out on the

10  news media because then he went on the Today Show and said it

11  again.

12         THE COURT:  You said he went on the media and you can

13  bring out the Today Show.  I prefer to keep the lawyers out of

14  this.  You can say his lawyer, a lawyer, but let's keep

15  Mr. Aidala out of it and Mr. Aidala will keep you and

16  Ms. Allred and everybody else out.  Okay?

17         MS. WANG:  Fair.

18         THE COURT:  One other quick thing.  I didn't rule

19  on -- I didn't think I --

20         MS. WANG:  I'm not going to use the medical.  That's

21  okay, is that what --

22         THE COURT:  Mr. Aidala objected to your telling the

23  jury about the rape kit.  That goes to what she went through

24  and her pain and suffering as far as I can tell so there is

25  nothing objectionable about that.

CAN5fie2                          Opening — Ms. Wang

1              Okay.  Let's go.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2              MS. WANG:  Sorry about that.

3              So, he told the police that he did not have sex with

4      her.  That was the first version of the story.  Then the

5      evidence came out, the DNA evidence came back, and now his

6      second version of the story came out.  Now defendant, Lawrence

7      Taylor's second story came out, and in January 2011 he pleaded

8      guilty and he testified in a court and he told the Judge that,

9      yes, I did have sex with the girl, with Cristina Fierro, and I

10     knew that in advance of having sex with her that I would have

11     to pay her.  But, once again, he didn't just tell the Judge,

12     and tell the courtroom, he also wanted to make sure he

13     protected himself and his reputation and he told the world.  He

14     went right from the courtroom to the national media and he gave

15     press interviews on ESPN, on Fox News, and he told the world.

16     And did he feel badly about the 16-year-old girl that he

17     sexually assaulted?  No.

18             MR. AIDALA:  Objection, your Honor.

19             MS. WANG:  He laughed.

20             THE COURT:  Let's move on.  Okay, Ms. Wang?

21             MS. WANG:  He joked.

22             But now it is not over because now he has to answer

23     one more time.  Now he has to protect himself again.  Now the

24     defendants has to convince you all that he did not commit

25     assault and battery and he has to convince you all that he

CAN5fie2                         Opening - Ms. Wang

1    didn't force himself on a 16-year-old girl.

2              MR. AIDALA:  Objection, your Honor.

3              THE COURT:  Yes.  I will instruct you as to the law

4    and the burdens of proof, ladies and gentlemen.

5              All right, Ms. Wang, go ahead.

6              MS. WANG:  Now, Mr. Taylor has a third version of what

7    happened and the evidence will show that in his deposition in

8    this case he has a new story.  In his deposition in this case

9    he's testified that it was a fan who was coming to visit him.

10   He understood that a friend called him and said that a fan was

11   going to come visit him to his room and it was his

12   understanding that this 16-year-old girl -- 16 years old, born

13   after most of his professional career was over, was coming and

14   that she was a Giants fan.  According to Taylor the evidence

15   will show that his deposition in this case shows that

16   Ms. Fierro was all giggly and smiles and that she had a

17   pleasant attitude and that he gave her $300 just because she

18   had a pleasant attitude, not because she had sex with her.  The

19   evidence will show that he says he picked $300 because he had

20   $10,000 in his pocket so $300 made sense own though the

21   evidence will show that Rasheed Davis talked about he had

22   somebody who wanted to pay $300 for Cristina Fierro.

23             Why does he have so many different stories?  The

24   evidence will show that he lies to protect himself to cover

25   what really happened -- that a scared and bruised and

1   frightened girl said no, pushed him off, and he knew that she

2   didn't want to have sex.

3          Ladies and gentlemen of the jury, this case is not

4   just a simple he-said-she-said.  This case is about a man who

5   thinks he can use people, throw them aside --

6          MR. AIDALA:  Objection, your Honor.

7          MS. WANG:  -- and make light of it.

8          MR. AIDALA:  Objection.

9          THE COURT:  Let's talk about this case, Ms. Wang.

10         MS. WANG:  Why did Ms. Fierro sue only Lawrence

11  Taylor?  Why did she not sue Rasheed Davis?

12         MR. AIDALA:  Objection, your Honor.

13         THE COURT:  Sustained.

14         MS. WANG:  The evidence will show, your Honor, that

15  Ms. Fierro, by her own testimony, will explain why it is that

16  she sued Lawrence Taylor.

17         MR. AIDALA:  Objection, your Honor.

18         THE COURT:  The jury will disregard that.  Go on,

19  Ms. Wang.

20         MS. WANG:  Ms. Fierro and I are grateful that we have

21  a jury system and that's not because we want your sympathy, we

22  don't seek your sympathy.  We ask that you please listen

23  carefully to the evidence.  Please, listen carefully to the

24  witnesses and pay attention to what they have to say and ask

25  yourself whether what they're saying makes sense and decide who

1    is telling the truth.

2         I look forward to coming back, returning at the close

3    of evidence to tell you that we have proved our case, and to

4    show you exactly how we have proven our case, that Lawrence

5    Taylor sexually assaulted Ms. Fierro.

6         Thank you very much for your attention.

7         THE COURT:  Thank you, Ms. Wang.

8         Mr. Aidala?

9         MR. AIDALA:  Good afternoon, ladies and gentlemen.  My

10   name is Arthur Aidala and along with Ottavio Mannarino and

11   Marianne Bertuna we represent Lawrence Taylor.

12        I just heard a very compelling story.  I need you to

13   concentrate on what the Judge told you before the lawyers

14   started talking.  A couple of things, number one, you just did

15   not hear evidence.  The Judge just said what I say is not

16   evidence, what she says is not evidence.  The evidence comes

17   from that stand and the Judge decides what comes into evidence

18   and what does not come into evidence.

19        You all need to use your common sense and you need to

20   look at this whole picture.  You need to look at the whole

21   picture because what you are going to find out is that the best

22   evidence in this case on behalf of Lawrence Taylor comes from

23   Cristina Fierro.  The best evidence -- because they need to

24   prove, they have the burden of proof, they have to prove

25   everything.  The Judge told you 10 minutes ago we don't have to

1    prove anything.  They have to prove that there was an assault

2    and a battery.  And what they're saying assault and battery is

3    it is not punching or hitting anybody with a weapon, the

4    assault and battery is sex, is nonconsensual sex, it is sex by

5    force, it is what we here in New York in New York commonly

6    refer to as rape.  Forcible rape.  The Judge will tell you the

7    elements but that's the common sense definition.  And what the

8    evidence is going to show is that in the minutes after this

9    took place when Ms. Fierro was interviewed by the New York City

10   Police Department, by police officers, by detectives she never,

11   ever said there was any force used.

12          What you will find out is in the hours after this took

13   place when she was interviewed by the detectives from Rockland

14   County, from Ramapo and she told them everything that went on

15   she never, ever said there was any force by Lawrence Taylor.

16          In the following days --

17          THE COURT:  Mr. Aidala, I wonder if you could keep it

18   down a little.

19          MR. AIDALA:  I apologize, Judge.

20          -- in the following days when she was interviewed by

21   the FBI.  This is a dispute between two people and now you are

22   going to learn that the Federal Bureau of Investigation, the

23   biggest law enforcement agency in our nation, is involved in

24   this case and they speak to her in those days and she never,

25   ever says Lawrence Taylor used force.

CAN5fie2                    Opening - Mr. Aidala

1              You are going to find out in the weeks afterwards she

2     meets with prosecutors from the United States Attorney's

3     office, federal prosecutors.  She meets with state prosecutors.

4     The evidence is going to show she meets with the chief of the

5     Sex Crimes Bureau of Rockland County, Patricia Gunning, a

6     veteran.  You are going to find she meets with the Chief of the

7     District Attorney's office, Arthur Ferraro.  The boss.  She got

8     all the justice that anyone could imagine in the criminal

9     justice system.  She had opportunity after opportunity after

10    opportunity to tell her story and she never told anyone that

11    Lawrence Taylor forced himself on her.  She told everyone it

12    was consensual.  But, the only reason why it is not consensual

13    is because in the State of New York someone who is 17 years old

14    is not allowed to have sex with someone who is older than 19 no

15    matter how much they want it, no matter how much they lie about

16    their age, no matter how many forms of identification they may

17    show that says that they're over 17 years old, they are not

18    allowed to have sex.  It is a crime for a man to have sex with

19    a woman who is under 17 and Lawrence Taylor did have sex with a

20    woman who was 16 years, 11 months and three weeks old.  If it

21    was one week later it would not have been a sex crime.

22             You will learn that Ms. Fierro had the opportunity,

23    through the district attorney's office in Rockland County,

24    through their detectives, she went into a grand jury, a grand

25    jury filled with jurors, people just like you, people who came

1    in for jury duty more than this, it has to be at least 16 to 23

2    people, by herself with the chief of the sex crimes bureau, a

3    veteran handling these cases, and she tells her story to those

4    grand jurors as long as she wants.  I'm not there.  Mr. Taylor

5    is not there.  There is no Judge there.  It is just her telling

6    her story to the people.  And when she told that story to the

7    people, to the citizens of the State of New York, nobody ever

8    charged Lawrence Taylor with any crime regarding force.  It has

9    consistently, in the minutes, the hours, the days, the weeks,

10   the months and even a year later, the NYPD, the Rockland PD,

11   the FBI, the United States Attorney's office, the district

12   attorney's office, the chief of the district attorney's office

13   and 20-some odd citizens just like you in the grand jury, they

14   all heard all of the facts and nobody accused Lawrence Taylor,

15   charged Lawrence Taylor, indicted Lawrence Taylor of anything

16   to do with lack of consent but for her age.  Those are the

17   people who are the guardians of victims.  It is called the

18   criminal justice system.  It is for people to get justice who

19   have been wronged and she had everyone at her disposal.

20         Lawrence Taylor got arrested.  He appeared before one

21   Judge in a lower court and he was charged with patronizing a

22   prostitute and he was charged with having sex with someone

23   under age.  No force.  Never any force.  And throughout the

24   course of this trial you need to keep in mind what the Judge is

25   going to instruct you at the end about the elements.  There is

CAN5fie2                         Opening - Mr. Aidala

 1    only one form of direct evidence here.  The only direct

 2    evidence comes from the plaintiff's mouth.  And when that

 3    plaintiff, before she was a plaintiff when she was a victim and

 4    she told her story to everyone involved in our criminal justice

 5    system on the state level and the federal level, after they

 6    heard her story, no one ever said okay, well, he should be

 7    charged with using force because she never said he forced her

 8    to have sex.  It is that simple.  Common sense.  No one told

 9    you to check your common sense at that door.  I need you to

10    bring it in here.

11            So, Mr. Taylor gets arrested.  You will find out when

12    he testifies he cooperates.  He goes into the DA's office, he

13    meets with the chief of the district attorney's office, the

14    chief of the senior trial assistants, DA's chief investigators

15    and tells them everything that happened, straight up.  He is in

16    there for hours he is going to tell you.  He is going to tell

17    you that they said they told him right then and there --

18            THE COURT:  Objection.  Is that what you're saying?

19            MS. WANG:  Yes, objection.

20            THE COURT:  Why don't you move on.

21            MR. AIDALA:  Sure.  So, he cooperates.  Shortly

22    thereafter he is going to tell you after that meeting he's

23    offered a plea bargain.

24            MS. WANG:  Objection, your Honor.

25            MR. AIDALA:  He pleads guilty.

1          THE COURT:  Yes.  Go ahead.

2          MR. AIDALA:  Shortly thereafter he pleads guilty.  He

3     goes in to Supreme Court in the State of New York and appears

4     before a judge, a state Supreme Court elected judge and that

5     judge swears him in and he has to plead guilty for what he did

6     that night and what that judge accepted, what he accepted from

7     Mr. Taylor was a plea bargain that the government, after doing

8     their intense investigation accused and said that this is what

9     Mr. Taylor was guilty of.  We find, your Honor, on this date he

10    had sex with a woman who was underage but that he didn't use

11    force, he didn't use violence because if any of these

12    prosecutors had a millimeter of evidence --

13         THE COURT:  Mr. Aidala, this argument.  This is not

14    evidence.

15         MR. AIDALA:  Okay.  I apologize, your Honor.

16         They said it is on the record.  They said he didn't

17    use force, he didn't use violence, it is just age, it is just

18    lack of consent because of age and he is sentenced to six

19    years' probation and he is sentenced to -- he has to register

20    as a sex offender.  And he is going to tell you he was in

21    court, the Judge instructed him that he had to cooperate with

22    probation.  He spoke to probation and he cooperated with them

23    as well.  And then came time for the sentence.

24         Mr. Taylor is going to tell you on the day of the

25    sentencing when in state court all that really is going to

1   happen on that day was the Judge was going to officially

2   sentence him.  It was supposed to be the easiest time of this

3   whole process for him.  Mr. Taylor is going to tell you he

4   pulls into the parking lot and there is another hundred cameras

5   in the parking lot and all of a sudden there is a big press

6   conference and all of a sudden there is a lawyer --

7            MS. WANG:  Objection, your Honor.

8            THE COURT:  That's all right.  Go ahead.

9            MR. AIDALA:  -- standing next to Ms. Fierro and

10  Mr. Taylor is going to tell you and Ms. Fierro is going to tell

11  you that up until that point nobody knew who Cristina Fierro

12  was.  She was only identified by her initials.  No one had any

13  picture of her, her name was never reported in any media

14  outlet, her picture wasn't anywhere.  She could have gone on

15  with her life and no one would have known she was involved in

16  this mess but, instead, a decision was made and there she was

17  front and center and she made a statement and she'll talk to

18  you about that statement that she made and all of a sudden when

19  not the prosecutors, not the FBI --

20           THE COURT:  Mr. Aidala, please don't argue.  This is

21  an opening statement.

22           MR. AIDALA:  I understand that, your Honor.

23           When those people are no longer standing by her side,

24  the criminal case is over and now there is a money lawyer

25  standing by her side.

1            MS. WANG:  Objection, your Honor.

2            THE COURT:  Sustained.

3            MR. AIDALA:  This case is about money, correct?

4            THE COURT:  Tell us what you are going to prove.

5            MR. AIDALA:  What I'm going to prove is that this case

6     is about money, and once Cristina Fierro decided her time with

7     the justice system was over, now it is time to get the money.

8     And where is she going to get the money from?  Use your common

9     sense, because what the plaintiff's attorney told you about all

10    these people who failed her in her life, you will hear about

11    it, she lived in nine different places, her mom failed her, her

12    father failed her.  You will hear about other people who failed

13    her.  Clearly this guy Rasheed Davis failed her.  There is a

14    lot of people who may owe her a debt but the evidence is not

15    going to show, they are not going to meet their burden that

16    Lawrence Taylor failed her.  The evidence is going to show that

17    on May 5th Lawrence Taylor was in town to do -- he was going to

18    work somewhere, he was going to be -- he was going to be a

19    celebrity, he was going to a function and he was going to shake

20    hands and sign autographs and hang out with people, and then he

21    got a phone call that night and the guy calls and it is a guy

22    he has dealt with before, he said, hey, Lawrence.  I know

23    you're in town, would you like company.  And he will tell you

24    that company means female companionship.  You don't know

25    exactly what it means, what exactly is going to happen, but

CAN5fie2                    Opening - Mr. Aidala

1     that's what it means.

2             So, now you have a man in his hotel room expecting a

3     female companion to show up and a female companion does show up

4     and Mr. Taylor is going to tell you everything was relatively

5     as normal as it could be under those circumstances.  I am not

6     condoning what he did.  It is a crime.  It is a crime he has

7     pled guilty to.  It is a crime he has been punished for and

8     another jurisdiction dealt with that.

9             What your job is and what the Judge is going to

10    instruct you is was an assault and battery occurred here, was

11    there force used, and Mr. Taylor is going to tell you there was

12    absolutely no force used.  He will tell you there was an issue

13    with her comfort level and I don't mean her psychological

14    level.  He is going to tell you physical comfort because he is

15    a big man and she is a small woman and he is going to tell you

16    that there was adjustments and physical adjustments in the way

17    they handled themselves.

18            And you heard the plaintiff's attorney said he went

19    down to kiss her in her groin area and he she said no, no, no,

20    and Mr. Taylor will tell you he stopped.  He stopped and put on

21    a condom.  As soon as he she said no he stopped.

22            Ms. Fierro is not going to testify that when she was

23    in that room and he reached out and touched her hair she said

24    please don't do that or stop.  She's not going to say that.

25    She's not going to say when he kissed her neck or kissed her

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    back she said stop and pushed him away.  She's not going to say

2    that.  He is not going to say when he turned her she said no.

3    She is going to say when he put his penis close to her vagina

4    she said you better have a condom and she supplied the condom.

5         After it was decided that Cristina Fierro was going to

6    sue Lawrence Taylor for money the story she told everyone else

7    changed.  You are going to hear a lot about this guy Rasheed

8    Davis.  The Judge is going to tell you the elements in this

9    case have to do with what took place in that room, not outside

10   of that room, not before that room --

11        THE COURT:  Mr. Aidala, I will give the instruction.

12        MR. AIDALA:  You are going to hear a lot about what

13   happened outside of that room.  I believe even Ms. Fierro is

14   going to testify Mr. Taylor didn't know what happened outside

15   that room.  He didn't know about Rasheed Davis.  He never knew

16   Rasheed Davis, who Rasheed Davis was.  He didn't know she got

17   hit.  And the evidence is going to show he never saw any bruise

18   on her face.  You are going to see the picture, maybe very

19   shortly.  It is not like this is some shiner like someone got

20   beat by Mohammed Ali.  Yes, you will see someone who has a

21   discolored eye and keep in mind, when listening to the

22   testimony, the evidence is going to show that the lighting in

23   the room is a television at issue; the light that comes off a

24   television.  Both Mr. Taylor and Ms. Fierro are consistent and

25   depending on which one you listen to Ms. Fierro says the light

1    stays off, Mr. Taylor says he put the light on but he never

2    says he sees a bruise.

3            You will not hear any evidence that Mr. Taylor

4    disparaged her in any way, called her any bad names, was rude,

5    was disrespectful in any way, shape or form.  They're saying

6    Mr. Taylor should have known that she was not consenting

7    because of her age, number one.  Well, they admitted to you she

8    lied to him about his age so that's out of the way.

9            Then about her injury.  There will be no evidence on

10   either side that Mr. Taylor saw her injury.  Christina will not

11   say oh he said what happened to your eye.  Mr. Taylor will not

12   say I saw her eye but I didn't think it was anything.

13           The plaintiff said she went to desperate measures to

14   avoid going to Lawrence Taylor's room that night.  The evidence

15   will show Ms. Fierro will testify on her way from Manhattan to

16   Rasheed's house and Rasheed is going to take her somewhere

17   else, on the way she reaches her aunt who she calls her aunt on

18   the phone, Dolores and says I'm afraid.  I'm afraid Rasheed

19   Davis is going to hit me.  At this point Cristina is in a cab

20   and Dolores says okay, come here, come to my house.  They're

21   only 10 blocks away in the Bronx.  She doesn't go to her aunt's

22   house, she doesn't go where her aunt -- the testimony is going

23   to say come here, come to safety.  She doesn't go there, she

24   goes to Rasheed's house.

25           They talked about how Rasheed Davis gave her ecstasy.

CAN5fie2                      Opening – Mr. Aidala

1   She's going to tell you how she had a fight with Rasheed two

2   days before because she stole ecstasy.

3           MS. WANG:  Objection, your Honor.

4           THE COURT:  Let's keep moving, Mr. Aidala.

5           MR. AIDALA:  Ladies and gentlemen, I don't have to ask

6   you a question just so you understand so I want you to listen

7   to Cristina Fierro with open ears and I am telling you to do

8   the same for Lawrence Taylor.  We will come in here -- and

9   there is a big difference in age between these two people and

10  big difference in background and I asked the Judge to apologize

11  to you in advance, I'm not happy about -- I'm not here to

12  embarrass anyone, I'm not here to make anyone feel bad.  I do

13  have to represent my client.  I am going to have to ask

14  Ms. Fierro some tough questions and I'm sorry about that ahead

15  of time but in the minutes, the hours, the days the weeks, to

16  the grand jury to everyone else, there was never any force used

17  until there was a suit for money.

18          She's going to tell you that she felt like she had no

19  choice.  The evidence is going to say -- she is going to say I

20  had no choice, I had to consent to having sex with Lawrence

21  Taylor because Rasheed Davis was in the car and if I didn't

22  have sex with Lawrence Taylor Rasheed Davis was going to beat

23  me up.  Well, if you believe her and she's telling you she

24  consented to having sex with Lawrence Taylor as far as that

25  reasonable person, as far as that person knows she's

1    consenting.  He doesn't know that there is someone outside

2    threatening her so she is consenting because she's afraid she's

3    going to get hit if she goes out there.

4          And, listen about the phone call.  She's able to stand

5    in the hallway, she's going to tell you, and call her uncle and

6    her uncle says call 911.  But in the same place where she calls

7    her uncle she doesn't get a signal from 911.  Listen to what

8    she tells you.  She enters the room and sees Mr. Taylor and

9    talks to him and says to Mr. Taylor, can I leave the room?  And

10   he goes yeah, sure; and she goes into the hallway.  Listen to

11   when she tells you there is a man at the security desk at the

12   Holiday Inn.  This is not at a $15 an hour hotel, she's at a

13   fancy Holiday Inn that there is a guy right there that could

14   help her.  Use your New York God given common sense and after

15   you heard the evidence you will figure out what this case is,

16   it is a money grab.  It is a money grab.

17         MS. WANG:  Objection, your Honor.

18         MR. AIDALA:  And think to yourself who should be

19   sitting there.

20         THE COURT:  All right, Mr. Aidala.

21         MR. AIDALA:  Should it be Rasheed Davis?  Everybody

22   knows L.T. but if L.T.'s name was John Doe would any of us be

23   here?  No.

24         MS. WANG:  Objection.

25         THE COURT:  Call your first witness.

CAN5fie2                           Opening – Mr. Aidala

1          MS. WANG:  Thank you, your Honor.  Plaintiff calls

2     Ms. Fierro to the stand.

3      CRISTINA FIERRO,

4          called as a witness by the Plaintiff,

5          having been duly sworn, testified as follows:

6     DIRECT EXAMINATION

7     BY MS. WANG:

8     Q.  Good afternoon.

9          Can you please tell the jury when you were born?

10    A.  May 13, 1993.

11    Q.  And where were you born?

12    A.  I was born in Brooklyn, New York.

13    Q.  Who did you first live with?

14    A.  My mother and my sister.

15    Q.  What is your sister's name?

16    A.  Katherine Rodriguez.

17    Q.  And how many -- what is the age difference?

18    A.  11 months apart.

19    Q.  Where were you living with your mother and sister?

20    A.  Reading, Pennsylvania.

21    Q.  Did there come a time when that changed, your living

22    situation?

23    A.  Yes.

24    Q.  When was that?

25    A.  In 2007.

CAN5fie2                        Fierro - direct

1    Q.  And how old were you?

2    A.  14.

3    Q.  And what happened in that year?

4    A.  My mom got incarcerated.

5    Q.  Can you tell the jury where you lived between the ages of

6    14 up until you were 17?

7    A.  I just bounced around.  I stayed with my dad and then I

8    moved to my best friend's house, and then it was just back and

9    forth between New York and Pennsylvania.

10   Q.  I want to direct your attention now to early 2010, okay?

11   Where were you living starting in late January 2010?

12   A.  I was staying in New York.

13   Q.  And who were you staying with?

14   A.  Dolores Manos and Jesus Pantoja.

15   Q.  And what is their relationship to you?

16   A.  My mom and my uncle, they grew up with them.  They were in

17   school together, elementary.

18   Q.  And how was it going living there?

19   A.  It was normal.  Like I would wake up and no one would be

20   home and it was, like an average -- your average relationship.

21   Q.  Did you get along with them?

22   A.  Me and Dolores not so much; we kind of like rubbed each

23   other the wrong way but it wasn't nothing major.

24   Q.  I want to direct your attention now to the spring of 2010.

25   Did there come a time when you met someone named Rasheed Davis?

CAN5fie2                      Fierro - direct

1   A.  Yes.

2   Q.  Can you tell the jury how you met him?

3   A.  I was at a bus stop and he came up to me and that's when he

4   started talking to me.

5   Q.  Did he ask you anything?  What did he say?

6   A.  He was bragging how he can buy me stuff and he can take

7   care of me and that was then.  And when the bus came he asked

8   me to go in his car and I hopped on the bus and he banged on

9   the window flashing money.

10  Q.  Did you ever see him again?

11  A.  Two weeks prior to that.

12  Q.  Two weeks prior?

13  A.  Yeah, like afterwards.

14  Q.  Two weeks after?

15  A.  Yes.

16  Q.  Had you been in touch with him in that time?

17  A.  No.

18  Q.  And so, can you describe how you came to know Rasheed

19  Davis?

20  A.  I seen him again on the opposite side of the street and he

21  came through the driveway and cut my path in walking.

22  Q.  And can you describe for the jury your relationship with

23  Rasheed Davis?

24  A.  Then I asked him if he was stalking me and he asked me

25  where did I live.  And at that time we exchanged numbers and we

CAN5fie2                        Fierro - direct

1   got something to eat down the street.

2   Q.  And did you become friends with Mr. Davis?

3   A.  Yes.

4   Q.  Did you start spending more time with him?

5   A.  Yes.

6   Q.  And at some point did he take you anywhere?

7   A.  We went to car shows and he took me to this fancy

8   restaurant.  He bought me sneakers and stuff like that.

9           MR. AIDALA:  Objection, your Honor.

10          THE COURT:  Overruled.  Go ahead.

11  BY MS. WANG:

12  Q.  Did he ever take you to a bar or a club?

13  A.  Yes.

14  Q.  Can you tell the jury about the first time that he did

15  that?

16  A.  First time we hung out he gave me ecstasy, and then once he

17  seen how I reacted to that then he asked me if we can go get a

18  drink and that's when he took me to the bar.

19  Q.  What did he do at the bar?

20  A.  At the bar he seen that I was out of it and so he asked me

21  to walk with him to the bathroom, which I did, and that's when

22  he took my clothes off for me and he made me put this lingerie

23  on.

24  Q.  What did you do at the bar then?

25  A.  Then he walks out with me and then I just sat at the bar,

CAN5fie2                          Fierro - direct

1   on the bar stool, and then I just had like guys coming up to me

2   starting a conversation and then I would dance with them and

3   then they would like put money in my, where like my straps of

4   what I was wearing.  And that's how that night went.

5   Q.  Did that ever happen again?

6   A.  Yes.

7   Q.  And about how many times did you go to bars and --

8   A.  Like all together?

9   Q.  Approximately.

10  A.  I would say like about 12 times.

11  Q.  Did you earn any money from that?

12  A.  Yes.

13  Q.  And did Mr. Davis take any of that money?

14  A.  The first day that I danced he let me keep it and then any

15  day after that then that's when he took it.

16  Q.  Did there come a time when you moved?

17  A.  Yes.

18  Q.  And can you tell the jury about that?

19  A.  Me and Dolores got into a confrontation and I just called

20  Rasheed up and asked him if I can stay at a house that he had

21  owned.

22  Q.  So, did you move into that house?

23  A.  Yes.

24  Q.  Was there anyone else living there?

25  A.  No.  Just me.

CAN5fie2                      Fierro - direct

1   Q.  Eventually were there other people living there?

2   A.  Yeah.  That week two other girls moved in.

3   Q.  Did you know who they were?

4   A.  No.

5   Q.  I want to direct your attention now to the evening of May

6   5, 2010.  What were you doing in the evening of May 5, 2010?

7   A.  I was hanging with friends on 42nd Street.

8   Q.  What were you doing?

9   A.  We were just walking around and taking pictures.

10  Q.  Did there come a time when Rasheed Davis tried to reach

11  you?

12  A.  Yes.

13  Q.  And can you tell the jury about that?

14  A.  He tried calling me and my phone was -- I had put my phone

15  on silent to begin with and he started calling me and I didn't

16  hear my phone.  And then there was a time where I looked at it

17  and I was ignoring his calls and that's when the threatening

18  text messages came in.

19  Q.  Did Davis use a nickname with you?

20  A.  Yes.  He called me Luv-Luv.

21  Q.  I want to hand you what I'm going to mark as Plaintiff's

22  Exhibit 1 and, your Honor, that is also Plaintiff's Exhibit 11

23  in your file.

24          THE COURT:  All right.

25          MS. WANG:  May I approach, your Honor?

CAN5fie2                          Fierro - direct

1                THE COURT:  You may.

2      BY MS. WANG:

3      Q.  Ms. Fierro, do you recognize what these are?

4      A.  Yes.

5      Q.  What are they?

6      A.  They're the text messages between me and Rasheed Davis.

7                MS. WANG:  I would move their admission, your Honor.

8                THE COURT:  Voir dire, Mr. Aidala, or any objection?

9                MR. AIDALA:  Your Honor, that's the redacted copy, is

10     that correct?

11               THE COURT:  I'm not sure.

12               MS. WANG:  Yes, your Honor.  I apologize.  It is.

13               MR. AIDALA:  Your Honor, I would ask the full copy be

14     put in, the unredacted copy.

15               THE COURT:  I have already indicated I will permit you

16     to inquire into the earlier calls.

17               MR. AIDALA:  Then I have no objection.

18               THE COURT:  All right.  I do need a copy of what you

19     are actually offering now.

20               MS. WANG:  Of course, your Honor.

21               THE COURT:  I only have the full Exhibit.

22               All right, you can proceed.

23               (Plaintiff's Exhibit 1 received in evidence)

24               MS. WANG:  Your Honor, may I publish this to the jury

25     now?

CAN5fie2                         Fierro - direct

1          THE COURT:  I don't think so.  Not right now.

2     BY MS. WANG:

3     Q.  Okay.

4          Cristina, can you read the first message listed there?

5     A.  It if you don't call me right now -- I don't know if I can

6     curse -- if you don't call me right now I'm fucking you up and

7     putting your shit out the door.  Its fucking late and you never

8     answered my call earlier.  If you stay out past 12, don't come

9     back, period.

10    Q.  Can you tell from the document what time that was sent?

11    A.  That was sent at 10:34 p.m.

12    Q.  On what evening?

13    A.  May 5th.

14    Q.  And then can you read the next text message?

15    A.  Then I replied and said:  I'm on Hunts Point.

16         THE COURT:  I'm sorry.  What did you say?  I can't

17    hear you.

18         THE WITNESS:  Oh.  I read the next one and the text

19    message I replied said I was on Hunts Point.

20         THE COURT:  All right.

21    BY MS. WANG:

22    Q.  And then what is the next message?  First of all, who is it

23    from?

24    A.  It was from Rasheed.

25    Q.  And what does he say to you?

CAN5fie2                          Fierro - direct

1    A.  He says:  Don't give a fuck.  You disrespected me again not

2    answering my calls.  You see my calls coming through.  Come get

3    your shit before I throw it out.  No more chances.  Whoever

4    you're with --

5             And then it is the second message that it was sent

6    together, it says:  No more chances.  Whoever you're with

7    should be taking care of you being you would ignore my calls

8    for them.  Come get your shit now.  You got one hour to be here

9    or your shit is trashed you dumb snake bitch.

10   Q.  And then what is the next message?  What time was that

11   message sent that you just read?

12   A.  That message was at 10:43, again, on May 5th.

13   Q.  And then what is the next message?

14   A.  I told him my phone -- my phone on silent, my fault.  You

15   really want me to leave?

16   Q.  And then the next message?

17   A.  He says:  You dumb bitch.  Come get your shit or else it is

18   in the dump.  I can't fuck with you.  I have a $150 call for

19   you and you out wasting time with bums.  Go stay with them and

20   see.  Like I knew  -- then that's when it goes back to what I

21   replied to him.

22   Q.  And what did you reply to him?

23   A.  It says:  Like I knew.  My phone was on silent and my

24   sister ain't a bum.

25   Q.  And how many more text messages are there there?

CAN5fie2                          Fierro - direct

1    A.   There is three more.

2    Q.   And what times are they at?

3    A.   The one that I replied to at 10:50 and then the three

4    messages after that are two minutes apart.

5    Q.   And can you read the next one, please?

6    A.   It says how you wind -- how you wind up.  You're not

7    sleeping here no more.  Just get your shit, bitch in one hour,

8    you fucking ho.  You're not with your sister.  You never ignore

9    my fucking call and dis me.

10   Q.   And then do you respond?

11   A.   Yes.

12   Q.   What do you write?

13   A.   I tell him my phone was on silent, I would never ignore

14   you.  You be knowing that.  You find any reason to come at me

15   you making me feel some type.

16   Q.   And what is the last message on the list?

17   A.   The last message says:  Where are you --

18   Q.   Who was it from?

19   A.   It was from Rasheed.  And it says:  Where are you?  I got

20   to bring you to a call.  If you fuck this up -- if you fuck

21   this up pick up your phone.  He's going to give you $300.  I'm

22   coming to get you.

23   Q.   What time was that?

24   A.   That was at 11:13.

25   Q.   Did you take a taxi back to that house?

CAN5fie2                    Fierro - direct

1   A.   Yes.

2   Q.   What was your plan?

3   A.   My plan was to take a taxi, go to Rasheed's house, pick up

4   my stuff since he told me to leave and so that was my plan, was

5   to take a taxi and then go to Dolores' house.

6   Q.   Did you reach out for help on the way?

7   A.   Yes.   I called Dolores.

8   Q.   What did you do when you got to that house?

9   A.   When I got out the house Rasheed was double-parked outside

10  and he was waiting outside and the minute my cab pulled up he

11  banged on the window.

12  Q.   And what happened next?

13  A.   And then I go upstairs and he is following behind me and

14  then I go to where my room was and the first thing I did was

15  take my suitcase out of the closet and start opening my

16  drawers.

17  Q.   By the way, what happened to the taxi, to the cab?

18  A.   He told my taxi to leave.

19  Q.   Had you done something different?  Had you told the taxi --

20            MR. AIDALA:  Objection, your Honor.

21            THE WITNESS:  No.  I told the taxi to stay.

22            THE COURT:  Just a minute, Ms. Fierro.

23            Please try not to lead.

24  BY MS. WANG:

25  Q.   Did you tell the taxi driver anything?

CAN5fie2                          Fierro - direct

1   A.  I told him not to leave.

2   Q.  What happened to the taxicab?

3   A.  As soon as I came out Rasheed told him to leave.

4   Q.  And what happened to it?

5   A.  And the taxi left.

6   Q.  So, directing your attention back to upstairs and in the

7   room and if you can just pick up and say what were you doing

8   when you got to the room?

9   A.  I went into my room and the first thing I did was grab my

10  suitcase and open my drawers and start putting my clothes into

11  the suitcase.

12  Q.  And what is Rasheed Davis doing?

13  A.  He is arguing with me.

14  Q.  What is he saying?

15  A.  He's asking me where have I been?  Why haven't I answered

16  his calls.

17  Q.  And is he saying anything else?

18  A.  He just says that he has dates for me to go on and that I

19  was going.

20  Q.  And does he use any -- does he say any number?

21  A.  When I went there he did say a $300 date and then I just

22  simply said I wasn't going.  And then he just asked for an

23  explanation about where have I been.

24  Q.  And did there come a time when the argument became

25  physical?

CAN5fie2                          Fierro - direct

1    A.  Yes.

2    Q.  What happened?

3    A.  He kept asking me where have I been and I told him I was

4    with my sister and he kept telling me to shut the F--- up, and

5    so then I began to talk back to him and then that's when he

6    just punched me straight to my face and punched me in my eye.

7    Q.  And, did he do anything else?

8    A.  He just -- after he punched me he like -- I curled up and

9    it was to the point where I fell on the floor and just curled

10   up and he just was kicking me and pulling my hair.

11   Q.  And did he do anything else?

12   A.  He made my nose bleed.

13   Q.  Was there anyone else present in the house when this was

14   happening?

15   A.  Yes.

16   Q.  Who else was present in the house?

17   A.  It was Vanessa and someone that I referred to as the

18   middleman.

19   Q.  Well -- withdrawn.

20          Do you know the name of the person you referred to as

21   the middleman?

22   A.  I called him -- to me his name was Mohammed and he also had

23   a nickname but I don't -- I just know it is something boy.

24   Q.  So when you say something boy was his nickname, something

25   boy --

CAN5fie2                         Fierro - direct

1   A.   No.   It's -- I don't -- I don't know what the beginning

2   part is, I just know it ended in boy.

3   Q.   And did you know anything about this man?

4   A.   I just knew that he was a music producer and he worked with

5   artists such as Busta Rhymes.

6   Q.   What happened after Rasheed Davis punched you?

7   A.   I heard Rasheed on the phone and he said that.

8              MR. AIDALA:   Objection.

9              THE COURT:   Do we need a proffer on this, Ms. Wang?

10             MS. WANG:   Yes.   Yes, your Honor.   Sorry.

11             THE COURT:   Why don't we take a 10-minute break,

12  ladies and gentlemen.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

CAN5fie2                          Fierro - direct

1              (Jury not present)

2              THE COURT:  You can step down, Ms. Fierro.

3              (Witness steps down)

4              THE COURT:  Mr. Wang, what are you trying to elicit?

5              MS. WANG:  We are trying to elicit --

6              THE COURT:  No, you asked her what did she say.

7              MS. WANG:  I wasn't trying to elicit that.  I was

8      trying to get that there had been a phone call where

9      essentially he indicated that he was having trouble with

10     Cristina and that he was offering another girl up who was blond

11     and blue eyed, was white, but that when he got off the call it

12     became clear that Ms. Fierro had to go instead.

13             THE COURT:  Well, you can have her testify to whatever

14     was said to her and that, with you --

15             MS. WANG:  Okay.

16             THE COURT:  I don't find this all that material.

17             MS. WANG:  I will move on, your Honor.  That's fine.

18     I apologize.

19             THE COURT:  Okay.

20             We can take a 10-minute break then.

21             Anything else you want to deal with before we do?

22             MS. WANG:  I just point out that we are going to get

23     to the surveillance video soon but I think there was no

24     objection to that so I would probably just ask that or can show

25     it to the jury right away.

CAN5fie2                        Fierro - direct

1           THE COURT:  When you are finished with the bulk of the

2    testimony about Rasheed and before you begin the testimony

3    about at the point where Ms. Fierro enters the room I would

4    like to give the instruction.

5           Mr. Aidala, fair enough?

6           MR. AIDALA:  Yes, your Honor.

7           THE COURT:  Okay.

8           So, if you just take a pause there I will instruct the

9    jury.

10          MS. WANG:  Okay.

11          THE COURT:  All right.

12          MS. WANG:  I will do my best to remember.

13          THE COURT:  Pardon me?

14          MS. WANG:  I will do my best to remember.

15          THE COURT:  I will stop you, Ms. Wang.

16          Yes, Mr. Aidala?

17          MR. AIDALA:  Your Honor, just regarding these text

18   messages.

19          THE COURT:  Yes.

20          MR. AIDALA:  First of all, has this been put into

21   evidence at this point?  I mean, she is reading everything from

22   them like they are in evidence.  I didn't hear them being

23   moved.

24          THE COURT:  Ms. Wang offered them, I believe.  I asked

25   you if you wanted to voir dire or object it.  I did not

CAN5fie2                          Fierro - direct

1    formally say they're admitted but they're admitted.

2           MR. AIDALA:  So then is the Court allowing me to get

3    into -- there is nine other messages that were redacted.

4           THE COURT:  Yes.

5           MR. AIDALA:  So I'm allowed to ask her about that.

6           THE COURT:  You earlier told me that you wanted to be

7    able to use previous calls and you can on cross-examination.

8           MR. AIDALA:  Thank you, your Honor.

9           THE COURT:  All right.

10          (Recess)

11          THE COURT:  Before we get the jury let me just say

12   this:  There was some discussion about certain exhibits that no

13   one was going to object to.  If that's the case then that

14   should be what I'm told and we can go ahead using the exhibit.

15   Otherwise, if there is an objection to the exhibit, first of

16   all there should be a foundation for it, it should be offered,

17   then there should be an objection and I can make a ruling.

18   Okay?

19          MR. AIDALA:  Thank you, your Honor.

20          THE COURT:  Let's get the jury.

21          MR. GOLDBERG:  One clarification, once it is admitted

22   can it be published to the jury?

23          THE COURT:  Under normal circumstances, yes, but I

24   don't see any reason since we have heard the testimony and I

25   don't want them sitting there trying to read this one by one in

CAN5fie2                          Fierro - direct

1    the middle of her testimony.  It is pressure, purely my

2    whimsical decision.

3            MS. WANG:  Your Honor, may I ask a technical question?

4    So we are going to have the surveillance video which I

5    understand that Mr. Aidala does not object to and just a

6    technical point that I want to make clear for you, my

7    understanding is that we can show it first just to the witness

8    and have her identify it but since there is no objection, is it

9    okay to publish that to the jury at the same time?

10           THE COURT:  Well, we did discuss it.  I thought we had

11   agreed because Mr. Aidala didn't object but I could be wrong,

12   that we could play it one time for everybody.  But I thought I

13   said that you should at least get up and identify it by number

14   and indicate what it is and you can say there is no objection

15   and then we will play it for everyone.  Agreed?

16           Is that all right, Mr. Aidala?

17           MR. AIDALA:  Yes, your Honor.  Before the jury enters,

18   your Honor, there will be a brief recess between direct and

19   cross?

20           THE COURT:  Yes.  There will be.

21           Okay.  Let's bring in the jury.

22           (Continued on next page)

23

24

25

1            (Jury present)

2                  THE COURT:  Ms. Wang, you may proceed.

3                  MS. WANG:  Thank you, your Honor.

4    BY MS. WANG:

5    Q.  Directing your attention back to when Rasheed Davis struck

6    you, how did he hit you?

7    A.  He punched me and he kicked me.

8    Q.  And how many times did he punch you?

9    A.  Many times.

10   Q.  Do you know how many?

11   A.  I don't know an exact number.

12   Q.  And how many times did he kick you?

13   A.  I would say like three times.

14   Q.  And did you feel pain when he kicked you?

15   A.  Yeah.

16   Q.  And what part of your body was he kicking?

17   A.  My ribs part, my ribs area.

18   Q.  Had he ever beaten you before?

19   A.  Never.

20   Q.  Had he ever asked you to have sex for money before?

21   A.  Yes.

22   Q.  Had you ever had sex for money before?

23   A.  No.

24   Q.  What happened after he beat you?

25   A.  I heard him on the phone.

CANLFIE3                              Fierro - direct

1    Q.  Okay.  What happened after that?

2    A.  After that, it was me and him just arguing.

3    Q.  And then what happened?

4    A.  And then he just pushed me on the bed and took my jeans

5    off, and he grabbed a dress that was in the other room.

6    Q.  And what happened -- and had you ever seen this dress

7    before?

8    A.  Never.

9    Q.  And what did he do with the dress?

10   A.  He forced it on me.

11          MS. WANG:  I'd like you to approach the witness and

12   hand her Plaintiff's Exhibit 2, your Honor.

13          THE COURT:  All right.

14   Q.  Cristina, do you recognize that?

15   A.  Yes.

16   Q.  What is it?

17   A.  It's the dress that I wore that night.

18   Q.  Can you hold it up.

19          Did you wear anything other than that dress?

20   A.  No.

21          MS. WANG:  I'm going to move for admission into

22   evidence, your Honor.

23          THE COURT:  Any objection?

24          MR. AIDALA:  No, your Honor.

25          THE COURT:  All right.  Exhibit 2 is admitted.

1        (Plaintiff's Exhibit 2 received in evidence)

2   Q.   What happened next?

3   A.   After he put the dress on, there was the middleman and he

4   was cleaning me up and he was talking to me and telling me

5   everything was going to be all right and he asked me my age.

6   After that Rasheed went downstairs and he grabbed my bag and my

7   shoes and said let's go.  And then that's when I went

8   downstairs.

9   Q.   And when you say he was cleaning me up, what did he do?

10  A.   He grabbed like a wet napkin and he was cleaning my nose.

11  Q.   And why was your nose have to be cleaned?

12  A.   Because when Rasheed had punched me, he made my nose bleed.

13  Q.   Did your nose stop bleeding at that point?

14  A.   It stopped but like when I looked in the mirror after that,

15  I just noticed I had like blood in -- dry blood in my nostrils.

16  Q.   And what did you tell the middleman your age was when he

17  asked you?

18  A.   I told him I was 16.

19  Q.   And then what happened next?

20  A.   After that everyone goes into the car.

21  Q.   And when you say everyone, who do you mean?

22  A.   It was Rasheed, Vanessa, and Mohammed and me.

23  Q.   And where was everyone sitting in the car?

24  A.   Rasheed is driving, Vanessa is in the passenger, I'm

25  sitting behind Vanessa, and Mohammed is sitting next to me.

CANLFIE3                    Fierro - direct

1   Q.  And what state are you in when you're in the car?

2   A.  I'm crying hysterically.  It couldn't -- it still didn't

3   like hit me what was going on.  I just knew that I wasn't in

4   the right state of mind.

5           THE COURT:  I'm sorry, I'm having a little trouble

6   hearing.  Could you keep your voice up, Ms. Fierro.

7   Q.  Do you know where you were going?

8   A.  No idea.

9   Q.  Do you know how long you were in that car for?

10  A.  I would say an hour, hour and a half.

11  Q.  And how long do you think you were crying for?

12  A.  I was crying for ten, 15 minutes.

13  Q.  Did there come a time when you stopped crying?

14  A.  Yeah.

15  Q.  Okay.  And what happened next?

16  A.  After I calmed myself down, I didn't have my phone.

17  Rasheed had tooken it when we were arguing.  And once I calmed

18  down, he then gave me my phone because it was ringing nonstop.

19  Q.  And why did you -- how did you calm down?

20  A.  I tried not to think about it and I put the window down and

21  got fresh air.

22  Q.  And why were you trying to calm down?

23  A.  Because I wanted my phone.

24  Q.  And what happened when you got the phone?

25  A.  The first thing I did was call my uncle.

CANLFIE3                    Fierro - direct

1    Q.  And what did you do?

2    A.  I started -- when I called my uncle and he answered, I

3    started telling him in Spanish because no one in the car knew

4    Spanish so I was telling my uncle what just happened.  And I

5    was telling him in Spanish, you know, Rasheed hit me, he made

6    my nose bleed, and now I'm being taken to somewhere.  I don't

7    know where I'm going.

8    Q.  And how did that conversation end?

9    A.  It started where I was just acting like my uncle was

10   yelling at me for having 23 missed calls.  So when he asked me

11   where was I going I told him in English I don't know where I'm

12   going.

13        And Mohammed told me to say, oh, tell him we're going

14   to a restaurant.

15        So I told him that and then I told him in Spanish that

16   he's lying.  I'm not going to a restaurant.

17   Q.  When you said you were trying to shout at your uncle, can

18   you explain to the jury what you mean by that?

19   A.  When I was shouting at him, I'm trying to make it seem like

20   he's arguing with me about not answering his call, but that's

21   just because I was in rage of what was going on.  And so I just

22   made it seem like, you know, my uncle was arguing with me.

23   Q.  And when you said 23 missed calls, what do you mean by

24   that?

25   A.  Him, between him and Dolores --

CANLFIE3                    Fierro - direct

1              MR. AIDALA:  Objection, your Honor.

2              THE COURT:  Sorry.  What was the question?

3              MS. WANG:  What did you mean by the missed calls, what

4     did she mean by the missed calls.

5              THE COURT:  What were the missed calls?

6              THE WITNESS:  That was when my uncle was calling me

7     and I couldn't answer.

8              THE COURT:  How do you know they were from your uncle?

9              THE WITNESS:  Because it showed it on my phone.

10             THE COURT:  All right.  Go ahead.

11    Q.  Did the car finally stop?

12    A.  Yes.

13    Q.  And by the way, were you able to tell your uncle at any

14    point where you were?

15    A.  Afterwards, yes.

16    Q.  I mean during that car ride, were you ever able to tell

17    him --

18    A.  No.

19    Q.  -- where you were.

20             Okay.  And why couldn't you tell him?

21    A.  Because I didn't know where I was going.

22    Q.  And when -- so did the car finally stop?

23    A.  Yeah.

24    Q.  And where were you when it stopped?

25    A.  I was at a Holiday Inn.

CANLFIE3                    Fierro - direct

1   Q.   How did you know that?

2   A.   Because I seen the sign on the building.

3   Q.   What happened next?

4   A.   The car stops.  Rasheed comes around the car and opens my

5   door and tells me to get out and so he walks me to the

6   building.

7   Q.   What were the words that he used?

8   A.   He told me to get out.

9            MR. AIDALA:  Objection.

10            THE COURT:  He told her to get out.  Overruled.

11   Q.   And then what happened next?

12   A.   He walks me to the building.

13   Q.   I want to show you what we will mark as Plaintiff's

14   Exhibit 3.

15            THE COURT:  Do I have that?

16            MS. WANG:  It's a video, your Honor.  It's the

17   security video.  It will be up on your screen and I'm going

18   to --

19            THE COURT:  Why don't you consult with Mr. Aidala and

20   just together agree on how you're going to identify this to the

21   jury and then we can all see it.  It shouldn't be showing right

22   now yet.

23            MS. WANG:  We've talked about how all three of these

24   clips will be called Plaintiff's Exhibit 3.

25            THE COURT:  Yes, that's fine.

1           And there's no objection, correct, Mr. Aidala?

2           MR. AIDALA:  No, your Honor.

3           THE COURT:  Would you mind just telling the jury what

4    this is.

5           MS. WANG:  Sure.  This is surveillance video from the

6    Holiday Inn that night.

7           THE COURT:  All right.  You can go ahead.  I think

8    everybody can see on their screens.

9           (Video recording played)

10   Q.  Ms. Fierro, do you know who's in that picture?

11   A.  Yes.

12   Q.  And who is it?

13   A.  It's Rasheed in the white hat and me walking along his

14   side.

15          MS. WANG:  Can you stop the video.

16   Q.  And what were you thinking when you were walking there?

17   A.  I just felt like I had to get away from him.

18   Q.  And can you explain that, what do you mean by that?

19   A.  I was already scared and terrified of the man just because

20   he never put his hands on me and when he finally did, that was

21   enough to break me.  So in my head on -- while we were driving,

22   I had a plan in my head that I was going to get help when he

23   dropped me off.

24          MS. WANG:  Okay.  And then if you can show the next

25   clip.

CANLFIE3                         Fierro - direct

1              (Video recording played)

2              MS. WANG:  Sorry, your Honor.

3    Q.  Do you recognize yourself there?

4    A.  Yes.

5    Q.  And are you walking the way you normally walk?

6    A.  I had just a tiny limp to my walk.

7              MS. WANG:  And then the next clip, please.

8    Q.  And it's hard to, see but can you see yourself in that?

9    A.  Yes.

10   Q.  And where are you?

11   A.  I'm on the other side of the pool.

12   Q.  And is there anyone with you?

13   A.  Rasheed Davis.

14   Q.  And do you remember that walk?

15   A.  Yes.

16   Q.  And where are you walking to?

17   A.  I was walking to Room 160.

18   Q.  And you saw you stopped at the end?

19   A.  Yes.

20   Q.  Do you know what that depicted, do you know what that

21   showed at the end of that video?

22   A.  Yeah, that I went into the room.

23   Q.  Do you remember the conversation -- withdrawn.

24              Did Rasheed Davis say anything to you as you walked to

25   the room?

CANLFIE3                          Fierro - direct

1          MR. AIDALA:  Objection.

2          THE COURT:  Overruled.

3    A.  As we were walking to the room he just kept saying don't F

4    this up.  And then after that, he tells me --

5          MR. AIDALA:  Objection.

6          THE COURT:  I think I've already ruled on this.

7          Go ahead.

8    A.  He tells me that my name is Carmen and I'm 19 and he told

9    me -- he told me that several times and I had to repeat that

10   back to him.

11   Q.  And just to be clear with the jury, when you said don't F

12   this up, what were the actual words he used?

13   A.  Don't fuck this up.

14   Q.  And what happened next?

15   A.  After that, I walked into the room and Rasheed stood there

16   until the door closed behind me.

17   Q.  Okay.

18         THE COURT:  All right.  Would this be an appropriate

19   time for the instruction?

20         MS. WANG:  I just wanted to ask one last question.

21         THE COURT:  All right.

22   Q.  Did Rasheed say anything to you about any amount of money

23   on the walk?

24   A.  While we was at the house he did.

25   Q.  And what did he say?

1             MR. AIDALA:  Objection.

2             THE COURT:  She testified to that already.

3             MS. WANG:  Thank you.

4             THE COURT:  Ladies and gentlemen, you've just heard a

5    lot of testimony relating to Ms. Fierro's interactions with

6    Rasheed Davis and the violence that she has testified that he

7    used against her.

8             I want to instruct you that Rasheed Davis is not a

9    party in this case, as you must have realized, and that the

10   evidence that you've heard concerning Rasheed Davis was

11   received for a particular limited purpose.

12            The evidence may be considered by you as evidence as

13   to how and why Ms. Fierro arrived at the defendant Lawrence

14   Taylor's hotel room, and it can be used by you to explain

15   Ms. Fierro's state of mind, her physical appearance, and the

16   actions in that room.

17            You cannot use the evidence that you've just heard on

18   its own as proof of the defendant's intent, the defendant

19   Lawrence Taylor's intent or knowledge.  The fact that Rasheed

20   Davis did certain things to Ms. Fierro does not necessarily

21   mean that the defendant, Lawrence Taylor, knew who Rasheed

22   Davis was or what he had done to plaintiff prior to her arrival

23   in his hotel room.

24            On the other hand, if plaintiff has submitted evidence

25   that could reasonably lead you to conclude that the defendant

1   did know of Rasheed Davis's actions, then you may consider the

2   evidence for that purpose.

3        All right.

4        MS. WANG:  Thank you, your Honor.

5   BY MS. WANG:

6   Q.  Ms. Fierro, how did you enter -- withdrawn.

7        When you got to the door, what did you -- what did you

8   see in the door of Room 160?

9   A.  Well, obviously I seen the number, 160, and the door was

10  opened.  And like any hotel room, there's a latch that's

11  supposed to lock your door, that was in between the door from

12  closing.

13       MS. WANG:  I'm going to ask to approach the witness

14  and to hand her what I'm marking as Plaintiff's Exhibit 4.

15       THE COURT:  All right.

16       If I didn't say it, three is admitted.

17       (Plaintiff's Exhibit 3 received in evidence)

18       THE COURT:  All right.  You can approach with

19  Exhibit 4.  And, Ms. Wang, what is that for me?

20       MS. WANG:  That is one of the pictures in Plaintiff's

21  Exhibit 12, your Honor.  I can give you the copy if you'd like

22  it of which one I handed her.

23       THE COURT:  All right.  Have you shown it to

24  Mr. Aidala?

25       MR. AIDALA:  Yes, your Honor.

1          MS. WANG:  Would you like a copy, your Honor?

2          THE COURT:  If I have the copies, if you just tell me

3    which one you're showing.

4          MS. WANG:  It's of the door.

5          THE COURT:  Okay.

6    Q.  Ms. Fierro, do you recognize, do you know what this picture

7    depicts?

8    A.  Yes.

9    Q.  Can you tell us what it is?

10   A.  It's the room which the man was in.

11   Q.  Okay.  And does it show what you described with respect to

12   how it was kept open?

13   A.  Yes.  It's the silver part that's right here.

14         MS. WANG:  Okay.  I would move for admission into

15   evidence, your Honor.

16         THE COURT:  Any objection?

17         MR. AIDALA:  No, your Honor.

18         THE COURT:  All right.  Exhibit 4 is admitted.

19         (Plaintiff's Exhibit 4 received in evidence)

20         MS. WANG:  May we publish that to the jury, your

21   Honor?

22         THE COURT:  I don't have a problem with the jury

23   seeing any of this.  Do you have a copy for each juror?

24         MS. WANG:  I don't.  I understood there was a way we

25   could publish it to them by putting it on the overhead, but

CANLFIE3                        Fierro - direct

1     there may be a misunderstanding.

2             THE COURT:  Is that correct?

3             MS. WANG:  Your Honor, just to save time, maybe she

4     can hold it up.

5             THE COURT:  Are you going to be putting any more of

6     these?

7             MS. WANG:  It depends on her testimony.  Probably not.

8             THE COURT:  So it's just this picture?

9             MS. WANG:  Yes.  At this point, yeah.

10            THE COURT:  All right.  You can then publish it to the

11    jury.

12            MS. WANG:  Okay.  May I just hold it up, your Honor,

13    to save time?

14            THE COURT:  That's fine.

15    Q.  What did you do after you walked into the room?

16    A.  I put my bag down.

17    Q.  And what was -- what did you see in when you first walked

18    in?

19    A.  I just seen the TV on.

20    Q.  Did you see -- did you see anybody?

21    A.  No.  When I walked in, I said hello and then I heard a

22    voice saying "I'm in here."

23    Q.  And what did that mean?

24    A.  He indicated that he was in the bedroom.

25    Q.  And could you describe the layout of the room?

1    A.  When I walk in, it's like a living room and there was a TV

2    on there and then there was a coffee table and a couch.  And

3    then if you go to your left, there's a bedroom.

4    Q.  Okay.  And so when you heard the words "I'm in here," what

5    did you understand where it was coming from?

6    A.  That he was in the bedroom.

7    Q.  Okay.  And then did you see that person?

8    A.  When I looked in, yes.

9    Q.  And what did you see?

10   A.  He flicked the covers over and he was naked.

11   Q.  Okay.  And do you see that man in the courtroom now?

12   A.  Yes.

13   Q.  And who is that?

14   A.  Lawrence Taylor.  It's the man in the room, yeah.

15   Q.  Before seeing him in the early morning hours of May 6,

16   2010, did you ever see him before?

17   A.  Never.

18   Q.  Did you know who he was?

19   A.  Never.

20   Q.  What did you do next?

21   A.  I put my bag down and I sat in the room and I remember

22   making an excuse to fix my hair or something.  And then I took

23   my cell phone, I went into the bathroom and tried to call my

24   uncle.

25   Q.  And what happened?

CANLFIE3                          Fierro - direct

1    A.  I couldn't.  So I tried texting because the call didn't go

2    through and thought maybe the text message.  I only had one bar

3    in the hotel room.

4            After that I come back in and I sit down.  I make up

5    another excuse and this time I go into the hallway.

6    Q.  Just to pause you for a second.  You used the phrase I only

7    had one bar in the hotel room.

8            Can you explain what you meant by that?

9    A.  Meaning the strength on my cell phone.  I only had the tiny

10   bar like of the strength signal on my cell phone.

11   Q.  Okay.  And so what did you do next?

12   A.  After that, then I went into the hallway and I hid behind a

13   post and I tried to call my uncle.

14   Q.  And were you able to reach him?

15   A.  Yes.

16   Q.  And what did he tell you or what did you say to him?

17   A.  I told him I was at a Holiday Inn but I don't know where

18   at.  And so he told me to dial 911 and put the phone in my bag.

19   Q.  And what did you do?

20   A.  I dialed 911.  After that I went inside and I dialed 911

21   and put the phone in my bag.

22   Q.  Okay.  What did you do next?

23   A.  After that, I sat on the opposite side of the bed from him

24   and I gave him my back.

25           And then I made up an excuse and I asked him can I

1   turn on the light.

2               He asked me for what.

3               And I told him to take my shoes off.

4               And he said why do you need the light to take your

5   shoes off for.

6   Q.  Okay.  And then what happened?

7   A.  We just started talking like small talk.  And he was trying

8   to be persistent and every time there was a silence he would

9   ask me to take my dress off and then we would talk more and

10  then it will just be a back and forth.

11  Q.  And when you said he kept being persistent, what did you

12  mean?

13  A.  Like he kept like going at it like on insisting for me to

14  take my dress off.

15  Q.  And did you at some point?

16  A.  Yes.

17  Q.  And what happened next?

18  A.  After that, I remember laying there and he asked me to take

19  my hair out, which I did.

20  Q.  And then what happened?

21  A.  He told me I had nice curly hair like his wife.  And then

22  we started talking about Mohammed and how Mohammed takes care

23  of him every time he comes down.

24  Q.  Do you know if he used the name Mohammed?

25  A.  No.  He used his nickname, but I know who he was referring

CANLFIE3                          Fierro - direct

1    to.

2    Q.  And then what happened next?

3    A.  He told me I was pretty.  He told me about where he reside

4    at, told me he had kids.

5    Q.  And what were you thinking this time?

6    A.  I'm just -- I still feel on edge because of like I'm laying

7    next to a stranger with like no dress on.  And so I'm thinking

8    any time I'm just going to see shadows coming and banging on

9    the door.

10   Q.  What do you mean by that, what are you thinking?

11   A.  My uncle told me to call 911 and put the phone in my bag,

12   so I indicated that the cops were going to show up there.

13   Q.  And did the cops come?

14   A.  No.

15   Q.  And so at some point did Lawrence Taylor start touching

16   you?

17   A.  Yeah, after like we had conversations and stuff like that.

18   Q.  And what did he do?

19   A.  He starts massaging me and, well, when we were laying

20   there, I gave him my back and then he starts massaging me and

21   then.

22   Q.  Can you tell the jury what you mean by "I gave him my

23   back"?

24   A.  I turned over on my side so I didn't pay him no mind.

25   Q.  Okay.  And so what did he do when he was massaging your

CANLFIE3                    Fierro - direct

1   back?

2   A.   Like I started moving away from him like -- I was just like

3   really uncomfortable.  And so after that, then it's like I

4   ended up like being on my stomach.

5   Q.   Okay.  Did there come a time --

6   A.   I mean on my back.

7   Q.   Did there come a time when he started to kiss or lick you?

8   A.   Yes.  That's when he licked my spine.

9   Q.   And what did he do?

10  A.   After he licked me on my spine, I was on my back and he

11  began to lick my vagina and I told him no and I told him to

12  stop.

13  Q.   And then what happened?

14  A.   And then he did stop and instead he's like laying on me.

15  So now I'm to the point where he's heavy and I feel like I

16  can't breathe.  And so he starts like since he's like laying in

17  between my legs and I'm like pushing him away from me like his

18  thighs.  And I make up an excuse and saying oh, put a condom

19  on.  And so he reached for one and as he's trying to go inside

20  me I'm pushing him out.

21  Q.   When you say you're pushing him out, what do you mean, what

22  did you do?

23  A.   I put my hands like on his waist, like his thigh area and

24  pushed him like downwards.

25  Q.   And did he get off?

CANLFIE3                    Fierro - direct

```
 1   A.  It felt like I wasn't doing anything.  I knew he can feel
 2   my hands on him, but it just felt like I wasn't making a
 3   difference because how big he was compared to me.
 4   Q.  What did he do next?
 5   A.  So after that, so after that, I pushed him.  I start -- I
 6   continuously push him off and I turn around and like he didn't
 7   even have the condom on all the way.
 8           And I make a comment, oh, you didn't put the condom on
 9   right.
10           And tells me, oh, I know what I'm doing.
11           And so before that, I was giving him hints.  I was
12   telling him I'm uncomfortable and this is my first time and to
13   me that didn't matter or like from his impression that he gave
14   me is like that didn't matter.
15   Q.  Okay.  Did you ever say to him "I'm uncomfortable"?
16   A.  Yeah, I told him several times.
17   Q.  And did he ever say anything back to you when you said
18   that?
19   A.  He would just reply as just relax.
20   Q.  Did you -- when you pushed him off, did he push back?
21   A.  Yeah.
22   Q.  Okay.  And did he ever -- did he ever put his penis in your
23   vagina?
24   A.  Yes.
25   Q.  And when he did that, what were you doing?
```

1   A.  I was squirming and trying get away from him.

2   Q.  And how did it physically feel when he was doing that?

3   A.  I felt uncomfortable like just him being on top of me and

4   it was really rough and painful.

5   Q.  What happened next?

6   A.  After that, now I'm on my stomach and I'm trying to squirm

7   away from him and he just keeps telling me just to relax and he

8   like pushes my hands out of the way and I guess that's when he

9   had finished.

10  Q.  And then what happened?

11  A.  He gets off of me and I realized that the condom got stuck

12  inside me and I'm crying because I'm scared because I never

13  like had this happen to me.  So I'm trying to reach up and I'm

14  trying to take the condom out but I just can't get it.

15          So I ask him, like I start freaking out and I ask him

16  to do it.

17          And he's like, oh, you can't get it out.

18          And I'm like jeez.

19          So he ends up getting it out and I just took all my

20  stuff and went into the bathroom and got dressed.

21  Q.  When you said you were freaking out, what did you mean,

22  what were you doing?

23  A.  Like I was crying like I just wanted to get it out.

24  Q.  And did -- withdrawn.

25          Earlier, when you were lying next to each other, did

CANLFIE3                    Fierro - direct

1   you see Lawrence Taylor's face?

2   A.  Yeah, I can make his face out perfectly.

3   Q.  And how come?

4   A.  Because the light to the TV, like we were by the end of the

5   bed and the TV shining directly in his face.

6   Q.  Okay.  And which side of you was next to him when you were

7   lying next to him?

8   A.  I'm lying on my left side.

9   Q.  Okay.  And when you were -- withdrawn.

10          Were there any other times that you cried?

11  A.  Yes.  When he told me to take my hair out and he was

12  touching my hair, I began tearing.

13  Q.  When you say tearing, what do you mean?

14  A.  Like I just had tears like coming down from my eyes because

15  I was, like I said, the whole time I was in there, I was just

16  waiting for shadows to come and just bang on the door and come

17  get me.

18  Q.  And when you said you were freaking out about the condom,

19  did Lawrence Taylor ever say that -- ask you if you were okay?

20  A.  Never.

21  Q.  Did he ever say sorry?

22  A.  No.

23  Q.  Did you ever tell the defendant using words "no, do not do

24  this"?

25  A.  No.

CANLFIE3                        Fierro - direct

1   Q.   Why not?

2   A.   I was scared.  Like I'd just been beaten and I just felt

3   like I had to or he would call Rasheed and then I would have to

4   deal with even more consequences after.

5   Q.   And did you communicate that you did not consent in other

6   ways?

7   A.   Yes.  I showed him multiple times.  I stalled.  I made up

8   every excuse I could.  I told him I was uncomfortable.

9   Q.   At some point when you -- withdrawn.

10          Directing your attention back to the first time you

11   went into the bathroom.

12   A.   Yes.

13   Q.   When you said you only had one bar of cell reception on

14   your phone, did you look in the mirror at that time?

15   A.   Yes, I did.

16   Q.   And what did you look like?

17   A.   My eye was bruised and my face was puffy from crying and I

18   just had dried blood in my nostrils.

19   Q.   What -- after you came out of the bathroom again, what --

20   did Mr. Taylor give you anything?

21   A.   Yes.  After I was coming out of the bathroom, he called me

22   in and at that point that was the only time he turned the light

23   on and he was at his night stand and he had his pants in his

24   pocket and he just pulled out money and said here, can you turn

25   the TV off on your way out.

1   Q.  And had you mentioned money at any time during?

2   A.  We didn't have no conversation about money.

3   Q.  Was there any number ever mentioned in that room?

4   A.  No.

5   Q.  How much did he give you?

6   A.  He gave me 300.

7   Q.  And what did you do next?

8   A.  I slowly walked from his hotel room out to the car.

9           MS. WANG:  And I want to I guess show what I'll mark I

10  guess also as Plaintiff's Exhibit 3, three more clips of

11  surveillance video.

12          THE COURT:  All right.  No objection?

13          MR. AIDALA:  No, your Honor.

14          THE COURT:  All right.

15          (Video recording played)

16  Q.  Can you identify -- it's very hard to see, but can you see

17  yourself in that video?

18  A.  Yes, I see myself now.

19  Q.  Where do you see yourself?

20  A.  On the other side of the pool walking out.

21  Q.  Is that the top of the screen?

22  A.  Yes.

23  Q.  And do you see yourself now?

24  A.  Yes.

25  Q.  And where are you?

CANLFIE3                     Fierro - direct

1   A.  I'm at the right hand of the screen.

2   Q.  Are you, in your style of walking, were you walking slowly

3   or quickly?

4   A.  Slowly.

5   Q.  Final clip.  And do you see yourself in this clip?

6   A.  Yes.

7   Q.  And where are you there?

8   A.  I'm walking past the two buildings, the two white poles.

9   Q.  The two while poles you said?

10  A.  Yeah, that's in the picture.

11  Q.  And what did you do after you walked by those poles?

12  A.  I just went into the car.

13  Q.  What did you do there?

14  A.  The minute I walked in, I closed the door and I put the

15  $300 on console.

16  Q.  On the console of the car?

17  A.  Yeah.

18  Q.  And what did -- what were you doing, why were you putting

19  it on the console?

20  A.  Because that's what I was there for was just to get the

21  money for Rasheed.  That's all he wanted.

22  Q.  Did you say anything?

23  A.  Yes.  After I gave him the money, I told him that he was

24  very rough on me and I was -- he made me uncomfortable and that

25  he was big and that the condom got stuck inside of me.

CANLFIE3                    Fierro - direct

1   Q.  What happened next?

2   A.  Then one of them says a smart remark about that, about the

3   condom being stuck inside me.  And they said, oh, someone would

4   die to have one of his kids.  But at that time I didn't know

5   what they really meant by that.

6   Q.  Did you know the name of the person in Room 160?

7   A.  No, I didn't.

8   Q.  And what happened then?

9   A.  After that, then Rasheed took the money and he gave a

10  hundred dollars to Mohammed and he kept the rest.  And then

11  from there, we went to -- we dropped Mohammed off and Rasheed

12  asked me to help him carry Mohammed's groceries inside his

13  house and I didn't do that.

14  Q.  Just to be clear, when you say Mohammed, was that?

15  A.  That was the guy who was sitting next to me that I don't --

16  I don't recall his nickname.  But when I was in the room, he

17  was -- I don't -- it just was something boy.  I just knew who

18  he was talking about when I heard boy at the end of the

19  nickname.

20  Q.  The nickname had the name boy in it?

21  A.  Yeah.

22  Q.  And what did you do during the drive back to the Bronx?

23  A.  I text my uncle.

24  Q.  And what were you trying to text him for?

25  A.  I text him, I told him that the 911 call did not work and

CANLFIE3                        Fierro - direct

1   that I was on my way home.

2   Q.  Okay.  And what happened when you got to -- withdrawn.

3          Did the car stop at some point?

4   A.  Yes.

5   Q.  And where did it stop?

6   A.  The first stop was at Mohammed's house, and then the second

7   time was at Rasheed's house that he owned.

8   Q.  And how did you know it was Mohammed's house?

9   A.  Because he took all his groceries and he went inside.

10  Q.  And did they ask you to do anything?

11  A.  They told me to carry the bags inside.

12          MR. AIDALA:  Objection, your Honor.

13          MS. WANG:  Withdrawn.

14  Q.  And then what was the next stop with the car?

15  A.  It was Rasheed's house.

16  Q.  And what happened there?

17  A.  My uncle text me and he told me to make sure I was the

18  first person to get out the car because that he had shown a

19  picture of me.  And I followed his instructions and the minute

20  Rasheed stopped the car, I got out and then cops came from both

21  ways.

22  Q.  Okay.  And did you speak to a police officer there?

23  A.  Yes.

24  Q.  And do you know what the police were doing?

25  A.  I don't think that the cop who was talking to me really

1    knew.

2              MR. AIDALA:  Objection.

3              THE COURT:  Sustained.

4    Q.  I was just trying to say did you observe the police do

5    anything?

6    A.  Yes.

7    Q.  What did you observe them do?

8    A.  Can you rephrase the question.

9    Q.  Did you see them take any action?

10   A.  Yes.  The first thing they did was cops came up to me and

11   talk to me and they split me and Vanessa up and then they

12   arrested Rasheed on the spot.

13   Q.  What happened next?

14   A.  After that, me and Vanessa were trying to talk to each

15   other and they split us up further.  And I had told the cop

16   what had happened and then he called the ambulance.

17   Q.  Okay, and did you go in the ambulance?

18   A.  Yes.

19   Q.  And where were you taken?

20   A.  I was going to -- I went to Jacobi Hospital.

21   Q.  And how long were you at the hospital?

22   A.  I was there from three in the morning till five in the

23   afternoon.

24   Q.  Five in the afternoon the next day?

25   A.  Yes.

CANLFIE3                        Fierro - direct

1    Q.  And what happened when you were at the hospital?

2    A.  They examined me.  They did a rape kit test.  And they

3    tried to do other tests and draw my blood but I refused that.

4    Q.  Why did you refuse?

5    A.  I was just scared to get my blood drawn.

6    Q.  Okay.  Did you ever attempt to leave the hospital?

7    A.  Yes.

8    Q.  Why?

9    A.  I'd been there, I was there for numerous of hours.  I

10   hadn't slept.  I felt dirty.  And I was just talking to people

11   nonstop.

12   Q.  When you say talking to people nonstop, can you tell who

13   those people were?

14   A.  It was all different kinds of people.  I had Rasheed's

15   probation officer come talk to me.  I had officers come talk to

16   me and I don't know their exact names, I just know a couple,

17   and --

18   Q.  Were you being interviewed?

19   A.  Yes, by all the people that went there they asked me

20   questions about what happened and stuff like that.

21   Q.  How many people do you think interviewed you when you were

22   at the hospital?

23   A.  I can't say a number.  It was just many people.

24   Q.  Do you think it was more than ten?

25   A.  Yeah.

CANLFIE3                          Fierro - direct

1  Q.  Did they all ask you the same questions?

2  A.  No.  They asked me probably like the same questions just in

3  a different way so they would get a different answer.

4  Q.  And were you -- did you ever -- did you always tell the

5  truth?

6  A.  Yeah, I always try to tell the truth.

7  Q.  And did you ever, did you ever -- withdrawn.

8          How were you feeling when you were at the hospital?

9  A.  I felt dirty.  I just didn't know how to deal with myself.

10  All I can do is just sit there and cry and then having to talk

11  about it, it made it worse because everyone was just coming in

12  to see me and I had to stay there.

13  Q.  Did anyone come visit you in the hospital?

14  A.  Just my sister and my uncle.

15  Q.  And what's your sister's name?

16  A.  Katherine.

17  Q.  Where did you go after the hospital?

18  A.  I went to Dolores's house.

19  Q.  And did there come a time when you were interviewed again

20  about the events after you left the hospital?

21  A.  Yes.

22  Q.  And about how many times were you interviewed after that?

23  A.  I would say like two or three times.

24  Q.  Did you ever come to learn that Lawrence Taylor was

25  arrested?

CANLFIE3                      Fierro - direct

1   A.  Yes, but I didn't know who he was.

2   Q.  And did you ever testify about the events that night to

3   anywhere?

4   A.  Yes, I did.

5   Q.  And where?

6   A.  I think that was in Rockland County.

7   Q.  Do you know what that was, who you were testifying in front

8   of?

9   A.  I testified in front of like just a jury.

10  Q.  Some kind of jury?

11  A.  Yeah.

12  Q.  Did you have a lawyer present then?

13  A.  No.

14  Q.  Did you ever come to learn what happened to the charges

15  with respect to Lawrence Taylor?

16  A.  Yes.

17  Q.  What did you learn?

18  A.  I learned that they were giving him six years' probation.

19  Q.  And how did you learn that?

20  A.  I was in Pennsylvania and I had these two people coming to

21  see me couple times a month.

22  Q.  Did you ever tell anybody that you were okay with that?

23  A.  No.  I told them it wasn't fair.

24  Q.  And how did you feel about that?

25  A.  I felt like it was unfair.

CANLFIE3                         Fierro - direct

1    Q.   Did you do anything about it?

2    A.   After that, then that's when I decided to get a lawyer.

3    Q.   And why did you decide to get a lawyer?

4    A.   Because I felt like --

5              MR. AIDALA:  Objection.

6              THE COURT:  Overruled.

7    A.   I felt like being 16 and not having a parent to question me

8    in front of like they were taking advantage of that.  And so I

9    decided to hire a lawyer, to see what's the probability of

10   doing it because I knew that everyone else was being protected

11   but me.

12   Q.   And how did you find a lawyer?

13   A.   I had asked my husband, well, he was my boyfriend at the

14   time.  I was going, I was looking on the internet and they were

15   telling me they couldn't help me.  So I turned to my boyfriend

16   at the time if he could help me and he had people he was

17   friends with in the law enforcement and his friend had told

18   him, oh, I'll call you right back.

19             MR. AIDALA:  Objection, your Honor.

20             THE COURT:  All right.  We'll going to have a side bar

21   so that we can get this straight.

22             (Continued on next page)

23

24

25

CANLFIE3                    Fierro - direct

1             (At the side bar)

2             THE COURT:  Mr. Aidala, you have certainly put her

3     motive in bringing the lawsuit into issue in your opening.

4             What are you doing now, Ms. Wang?

5             MS. WANG:  I'm just trying to explain what her

6     motivation for filing the lawsuit was and why she had an

7     attorney and also why she made a statement which I believe

8     Mr. Aidala is going to use.

9             THE COURT:  Tell me what it is you're eliciting.

10            MS. WANG:  That she hired a lawyer but it was her

11    decision and it was to protect herself and.

12            THE COURT:  And she said all that.  Now what?

13            MS. WANG:  And that also she decided to make a

14    statement herself after the sentence.

15            THE COURT:  Do you object to that?

16            MR. AIDALA:  Not if she says I decided to make a

17    statement myself.

18            THE COURT:  Her testimony is a little rambling and I

19    can't tell where she's going.

20            MS. WANG:  Okay.

21            THE COURT:  So if you can start with even a leading

22    question.

23            I don't know where you're going next.  Where are you

24    going?

25            MS. WANG:  Well, I actually probably -- I'll finish

CANLFIE3                    Fierro - direct

1    this, but I actually have to go back because my cocounsel

2    reminded me that I skipped a section.

3              THE COURT:  All right.  But we're all in agreement

4    that this is an issue.  Obviously, her motivation in bringing

5    this lawsuit is an issue.

6              MR. AIDALA:  Yes, your Honor.

7              THE COURT:  And the plaintiff is entitled to tell us

8    what prompted her to get a lawyer.  You're going to get to

9    cross-examine.

10             MR. AIDALA:  Thank you, your Honor.

11             THE COURT:  Okay.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

CANLFIE3                         Fierro - direct

1                 (In open court)

2                 THE COURT:  Thank you, Mr. Aidala.

3                 Ms. Wang, you may go ahead.

4    BY MS. WANG:

5    Q.  Did you hire a lawyer?

6    A.  Yes.

7    Q.  What was the name of your lawyer?

8    A.  James Pauliet.

9    Q.  And did you ever hire another lawyer?

10   A.  He referred me to Gloria Allred.

11                MS. WANG:  Your Honor, I just want to step back for a

12   moment because I skipped something.

13   Q.  And so I want to direct the witness's attention to when you

14   were at the hospital.

15                Did there come a time when anyone took any photographs

16   of you?

17   A.  When they took -- I believe so.  But to my knowledge, my

18   first time that they took a picture was in Rockland County when

19   I had to show a picture to the jury of what my eye looked like.

20                MS. WANG:  I'm going to hand up, I'd like to hand up

21   to the plaintiff Plaintiff's Exhibit No. 5, which is a set of

22   six photographs which I can provide copies to.  And, your

23   Honor, that is your Plaintiff's Exhibit 10.

24                THE COURT:  Okay.  You've seen these, Mr. Aidala?

25                MR. AIDALA:  Yes, I have, your Honor.

1           THE COURT:  All right.  How many photographs are

2     there?

3           MS. WANG:  There are six, your Honor.

4           THE COURT:  Okay.

5     Q.  Can you identify, can you identify these, Cristina?

6     A.  Yeah.  Picture No. 1 is a picture of the injury that was on

7     my right eye.

8     Q.  Well, all of the pictures, what do the pictures depict?

9     A.  It's the bruise that was on my --

10          THE COURT:  Ms. Fierro, are these pictures of you?

11          THE WITNESS:  Yes.

12          THE COURT:  I think that's what your lawyer is asking.

13    Q.  And do you know when these were taken?

14    A.  This was I think when they brought me in for questioning.

15    Q.  And so approximately when was that?

16    A.  Probably like I would say I think like two days later,

17    yeah, about two days later.

18    Q.  When you say two days later, two days after being in the

19    hospital?

20    A.  Yeah.

21          MS. WANG:  I would move these into evidence, your

22    Honor.

23          THE COURT:  Voir dire?

24          MR. AIDALA:  I'm going to object at this point, your

25    Honor.  There's not enough foundation yet unless you want me to

CANLFIE3                          Fierro – direct

1    voir dire.

2              MS. WANG:  I'll ask one more question, your Honor.

3    Q.  Ms. Fierro, do these pictures accurately depict the way

4    that you looked two days later?

5    A.  No.  Just the swelling just went down and, of course, my

6    nose was cleaned up.

7    Q.  Listen closely to my question.

8              Do these pictures accurately depict the way that you

9    looked when they were taken?

10   A.  Yeah.

11   Q.  Okay.

12             THE COURT:  Do you have an objection?

13             MR. AIDALA:  Yes, your Honor.

14             THE COURT:  Overruled.

15             Do you want to voir dire before I rule or not?

16             MR. AIDALA:  Yes, your Honor.  I asked, yes, I'd like

17   to voir dire.

18             THE COURT:  Go ahead.

19             MR. AIDALA:  May I, your Honor?

20   VOIR DIRE EXAMINATION

21   BY MR. AIDALA:

22   Q.  Ms. Fierro, where were these pictures taken?

23   A.  Where?  Rockland County.

24             THE COURT:  Excuse me.  Ms. Wang, you may be more

25   comfortable seated.

CANLFIE3                    Fierro - direct

1    Q.  Where in Rockland County?

2    A.  In a conference room that we had that we were in.

3    Q.  In what building are you?  Where are you?

4    A.  I don't recall.  I just know I was in Rockland County.  I'm

5    guessing the courthouse.

6    Q.  So you don't know if you were in the police station or the

7    district attorney's office or the courthouse?

8    A.  No.  I just know I was in Rockland County.

9    Q.  And you said this was two days later?

10   A.  Yeah, I believe so.

11   Q.  So you were in the hospital during the day on Thursday,

12   May 6; is that correct?

13   A.  Yes.  I was there from the day that it happened until the

14   same day at five.  And then from there I went to Dolores's, and

15   then after that day, that's when they picked me up.

16   Q.  So that would be Friday, the 7th; is that correct?

17   A.  Yeah.

18   Q.  And who picked you up?

19   A.  I don't know.  I want to say the police or the FBI or

20   someone because they came to the house and picked me up.

21   Q.  The people who picked you up, were they the ones who took

22   the picture or did someone else take the picture?

23   A.  I don't recall.  To the best of my memory, I don't.

24   Q.  Do you remember if a man took the picture of you or a

25   woman?

CANLFIE3                          Fierro - direct

1   A.  A woman took a picture.

2   Q.  And you believe it was some sort of an official building in

3   Rockland County, correct?

4   A.  Yes.

5   Q.  And do you know if they used a camera with a flash?

6   A.  Yes, they did.

7   Q.  They used a camera with a flash.

8         And was it in a room that was brightly lit like this

9   room here?

10  A.  No, it just had regular lights in it.  It wasn't --

11  Q.  It was a regular office building type of room?

12  A.  Yeah, it was like a conference room.

13  Q.  And you said that these photographs fairly and accurately

14  represent what you looked like on that day, on Friday, correct?

15  A.  Yes.

16         MR. AIDALA:  Your Honor, I'm going to object.

17         THE COURT:  I'm sorry.  You're renewing your

18  objection?

19         MR. AIDALA:  Yes, your Honor.

20         THE COURT:  All right.  Overruled.  They'll be

21  admitted.

22         (Plaintiff's Exhibit 5 received in evidence)

23         MS. WANG:  Your Honor, I would for efficiency --

24  withdrawn.

25  Q.  Just to follow up, Ms. Fierro, do you know precisely which

CANLFIE3                      Fierro - direct

1   day it was or is it approximately two days later?

2   A.  It's approximately.  I don't know for sure.

3   Q.  Okay.

4       MS. WANG:  Your Honor, I would like to publish these

5   to the jury, but my understanding is that we may need some

6   technical assistance in using that.  The alternative is I could

7   pass it to the jurors.  It's your Honor's preference.

8       THE COURT:  Can we use this or not, do we know?

9       MS. WANG:  My understanding is we need some

10  assistance, your Honor.  I apologize.

11      THE COURT:  All right.  Then you can go ahead and pass

12  them to the jury.

13      MS. WANG:  Thank you, your Honor.  I apologize.

14      (Pause)

15  Q.  Ms. Fierro, did you -- was your eye -- withdrawn.

16      When these pictures were taken, was your eye more or

17  less swollen than the several days before when you were in the

18  hotel room?

19  A.  Less.

20  Q.  And was your eye improving at this point when the pictures

21  were taken?

22  A.  Yes.

23  Q.  And was your eye more or less discolored several days

24  before when you were in the hotel room?

25  A.  It's about the same.

CANLFIE3                         Fierro - direct

1   Q.  Now I want to direct your attention, Ms. Fierro, to

2   March 2011.  Do you remember what happened then?

3   A.  Yes.

4   Q.  Can you tell the jury?

5   A.  I went to Mr. Taylor's sentencing hearing.

6   Q.  And why was that?

7   A.  Basically because -- I don't know.  I just felt like I had

8   a right to be there.

9   Q.  And did you ask for an option to be heard?

10          MR. AIDALA:  Objection, relevance.

11          THE COURT:  Sustained.

12  Q.  Were you able to speak?

13  A.  No.

14          MR. AIDALA:  Objection, relevance.

15          THE COURT:  You didn't speak.  Okay.

16  Q.  Did there come a time when you did make a statement?

17  A.  Yes.

18  Q.  And where was that?

19  A.  That was outside the courthouse.

20  Q.  And who made the decision?

21  A.  I did.

22  Q.  And why did you make a decision to make that statement?

23  A.  Because I felt like no one heard my side of the story and I

24  wanted to have a voice and I wanted to stand up for myself.

25  Q.  Did you use your name when you spoke?

CANLFIE3                         Fierro - direct

1    A.   No.

2    Q.   Whose decision was it to sue Lawrence Taylor in this

3    matter?

4    A.   Mine.

5    Q.   And why didn't you sue Rasheed Davis?

6    A.   Because I felt like Rasheed Davis is accountable for his

7    actions and Taylor is not.

8    Q.   When you say accountable, I want to just clarify.

9           Do you have any understanding what happened to Rasheed

10   Davis in connection with these events?

11   A.   Yes.

12   Q.   What happened?

13   A.   He was incarcerated.

14   Q.   Do you know for how long?

15   A.   Seven years and five years' probation.

16   Q.   Ms. Fierro, can you describe to the jury how you feel --

17   withdrawn.

18          Can you describe how these events have impacted you?

19   A.   It's -- it was difficult and it still is difficult for me

20   to act like nothing ever happened and I shut myself out.  I

21   just like sticking to myself and I'm antisocial and I'm just

22   not the same.

23   Q.   Does it affect the way you sleep?

24   A.   Yeah, because I have racing thoughts and nightmares and...

25   Q.   Do you -- have you sought any help?

CANLFIE3                          Fierro - direct

1   A.   Yeah.  I went to a psychiatrist.

2   Q.   Okay, and when was that?

3   A.   I don't remember the first time that I went.

4   Q.   Okay.  Did you go right away?

5   A.   No, because I didn't have health insurance.

6   Q.   And do you take any medications now that you didn't take

7   before?

8   A.   Yes.

9   Q.   What kind of medications do you take?

10  A.   I take Celexa, Ambien, and Xanax.

11  Q.   And how do those help you?

12  A.   They help me in the sense of I feel like I'm normal, like I

13  can act my normal behavior like I normally would.  I'm not

14  as -- I'm not social with anyone.  I don't really talk much.

15  Like I don't like talking about myself.

16           And the other medications help me with going to sleep

17  because it makes you not think of anything and it makes you

18  fall asleep faster.

19  Q.   Ms. Fierro, where do you live now?

20  A.   I reside in New Holland, Pennsylvania.

21  Q.   And who do you live with?

22  A.   I live with my husband, his grandmother, and his aunt.

23  Q.   And when did you get married?

24  A.   I got married March 9 of 2012.

25  Q.   And, Ms. Fierro, how tall are you right now?

CANLFIE3                         Fierro - direct

1   A.  I'm five-seven.

2   Q.  How tall were you in May 2010?

3   A.  I was five foot five.

4   Q.  And how much did you weigh at the time?

5   A.  I weighed 110 pounds.

6   Q.  And how much do you weigh now?

7   A.  I weigh 120.

8   Q.  Ms. Fierro, you mentioned racing thoughts.  Can you

9   describe what that means?

10  A.  It's nonstop thoughts like one thought comes in and then by

11  the time -- I can't even finish processing that one and I have

12  another one and it's just ongoing thing and I can't sleep.

13  Q.  In terms of how you feel, how were you feeling in May,

14  June, July 2010?

15  A.  In July I felt suicidal and I was -- I went into I think

16  it's North Central Hospital.  I don't recall if that is the

17  hospital.

18  Q.  And why was that?

19  A.  I felt suicidal because I felt low about myself.  I was

20  cutting my arm.

21  Q.  Has that decreased over time -- withdrawn.

22          Have you cut your arms since then?

23  A.  Once after that and that's it.

24  Q.  Do you have any physical symptoms of these emotions?

25  A.  No.

CANLFIE3                    Fierro - direct

1    Q.  How often do you think about the events of May 6, 2010?

2    A.  It just -- I wouldn't say I think about it every day, but I

3    just -- it just still affects me because I feel low about

4    myself.  I have a low self-esteem and like I feel like I'm

5    worthless.

6    Q.  Is it fair to say that you try not to think about it?

7    A.  Yeah.

8            MS. WANG:  No further questions, your Honor.

9            THE COURT:  All right.  Ladies and gentlemen, I intend

10   to take a break between the completion of the direct, which

11   we've just come to, and the beginning of cross-examination and

12   then we'll start cross-examination.  So if I could ask you to

13   go to the jury room for about ten minutes, we'll get you back

14   and begin cross.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

CANLFIE3                    Fierro - direct

 1            (Jury not present)

 2            THE COURT:  All right.

 3            Ms. Fierro, you can step down.

 4            Mr. Aidala, counsel, are there any issues that need to

 5    be brought up now before you begin your cross?

 6            MR. AIDALA:  No, your Honor.  I'm just wondering how

 7    long we're going today.

 8            THE COURT:  Until five.

 9            MS. WANG:  Your Honor, I just wanted to ask about the

10    412 issue.  We just have that concern.

11            THE COURT:  I thought the understanding was if you

12    intended to bring up any 412 issues or information on cross,

13    you were going to give me a proffer and then I was going to

14    rule.  That's why we're taking the break.

15            MR. AIDALA:  I apologize, your Honor.

16            THE COURT:  That's all right.

17            MR. AIDALA:  Your Honor, I do intend to ask her about

18    the results of the rape kit and the DNA that was recovered from

19    that and the fact that there was semen from two different men

20    found inside of her, one of them being Lawrence Taylor.

21            I did intend to bring out what she mentioned in her

22    deposition that she had had sexual relations hours before she

23    was with Mr. Taylor, she had sex hours before she was with

24    Mr. Taylor, that prior to living with Dolores who she testified

25    to, she lived I think in two different places with two

1   different boys.  I wasn't going to ask about her sexual

2   activity with those boyfriends, but just the fact that she has

3   identified them as boyfriends.

4        And then I was going to confront her with the sworn

5   affidavit of the FBI agent who arrested Rasheed Davis who

6   basically said that Ms. Fierro worked for Mr. Rasheed Davis

7   getting paid $80 for oral sex and $150 for sex.  That's off the

8   top of my head, but I'm pretty sure that's correct.

9        MR. GOLDENBERG:  Your Honor, with respect to the first

10  two points, plainly the fact that she had sex with someone a

11  few hours before Mr. Taylor is completely irrelevant.  We

12  briefed this issue fully and we --

13       THE COURT:  Before you go any farther, what arguments

14  are you going to make with respect to the physical evidence in

15  the case, Ms. Wang?

16       What have we brought out so far, that there was a rape

17  kit done.

18       MS. WANG:  That there was a rape kit done and that she

19  had an injury.  I'm not sure if I'm understanding your

20  question, your Honor.

21       THE COURT:  Well, I'm not talking about the injuries

22  that she's testified Rasheed Davis gave her.

23       Are you making any arguments based on any physical

24  evidence that there was, from the rape kit or otherwise, that

25  there was force during?

CANLFIE3                    Fierro – direct

1              MS. WANG:  No, your Honor.

2              THE COURT:  Okay.  That's all I'm asking.  All right.

3         Then I don't think it's relevant, Mr. Aidala, that

4    there was two different sets of semen.  There's no argument

5    here that any of the physical evidence is being used as

6    relevant to the amount of force or to the use of force in

7    Ms. Fierro's encounter with Mr. Taylor.  Under that

8    circumstance, I don't think that the fact that there was other

9    semen is relevant and I think it would be precluded under 412.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAN5fie4

1          MR. AIDALA:  What about what Ms. Fierro was doing

2    immediately prior to Rasheed Davis instructing her to come back

3    to the Bronx because he has a call for her?  My argument is she

4    wasn't out -- and not my argument.

5          THE COURT:  Hold on, hold on.  The first thing, I'm

6    precluding you bringing out that there was another man's semen

7    found on the DNA that was tested.

8          MR. AIDALA:  Yes, your Honor.

9          THE COURT:  I also think it is irrelevant that she may

10   have previously lived with two boyfriends.  Is that what you're

11   talking about?

12         MR. AIDALA:  Yes, your Honor.

13         THE WITNESS:  They're two years apart.

14         THE COURT:  What is your proffer on that?

15         MR. AIDALA:  It was mentioned that she lived at nine

16   different places with many different people.  I would like to

17   talk about where she lived and with whom.  She just

18   testified -- the last thing she said was her feeling of

19   worthlessness and low self-esteem.

20         THE COURT:  Ms. Wang, you did go through her

21   background and where she was living.  I will permit you to ask

22   her where she was living and who she was living with but I want

23   no mention about, no question about sexual relations.

24         Do you understand, Mr. Aidala?

25         MR. AIDALA:  Yes, your Honor.

CAN5fie4

```
1          THE COURT:  What is the third thing you are

2    proffering?

3          MR. AIDALA:  Where she was immediately prior to the

4    events in question, so when Rasheed Davis is texting her you

5    better get here, you better come back home, and she's answering

6    the text which I am with my sister which she admits is a lie,

7    she was with a young man and they were having sex and that was

8    why she didn't want to come back, and my understanding was,

9    according to her deposition, that young man actually went and

10   got her a cab and put her in a cab and sent her to Rasheed

11   Davis.  That's very relevant because her argument is that she

12   was in such fear -- her grand jury minutes was I thought I was

13   going to Rasheed Davis' house and he was going punch me.

14         THE COURT:  You know what we are going do?  I'm going

15   to call the jury back in and let them go because I promised I

16   wouldn't keep them past 5:00 and clearly I need to hear these

17   arguments and I'm not going to keep them in there and then send

18   them home.

19         Bring in the jury.

20         (Continued on next page)

21

22

23

24

25
```

CAN5fie4

1                    (Jury present)

2                    THE COURT:  Ladies and gentlemen, there are several

3     matters that I need to deal with this evening and I don't want

4     to keep you sitting there and not have any time before 5:00 to

5     actually begin the cross-examination, or very little amount of

6     time, so I am going to excuse you now for the day.  I remind

7     you that you may not discuss the case among yourselves or with

8     anybody else and I also order you to avoid any information that

9     may be reported about the case.  If something comes on

10    television -- I don't know that it will -- I would doubt it --

11    or if you see something in the newspaper, please ignore it.

12                    I would like you to come in tomorrow at 9:15.  Court

13    will start at 9:30 but we will have breakfast in there for you

14    so everybody will be ready to go.

15                    (Continued on next page)

16

17

18

19

20

21

22

23

24

25

CAN5fie4

1          (Jury not present)

2          MR. GOLDBERG:  Would it be all right if we took a two

3     minute break?

4          THE COURT:  We can take five minutes.

5          (Recess)

6          THE COURT:  Please be seated, everybody.

7          So I have made two rulings:  You may not raise the

8     issue on cross-examination of the second set of semen from the

9     rape kit.  You may inquire as to where she lived and with whom.

10    Okay?

11         Now, what is No. 3?

12         MR. AIDALA:  May I just put my objection officially on

13    the record regarding the rape kit?

14         My understanding is the plaintiff opened the door.

15    She talked about the rape kit.  They said the rape kit was

16    conducted and left it hanging out there about what is the

17    conclusion of the rape kit.  The conclusion of the rape kit is

18    that there is semen from two men.  This young woman testified

19    this was my first time.  We don't know exactly what that means.

20    What is her first time?  I don't know what it means but she

21    said, that was her testimony, this is my first time.  And she

22    said it multiple times, your Honor.

23         Your Honor -- you ruled days ago that we were going to

24    let a lot of context come in.  A lot of context came in in the

25    course of this examination so my argument is by the plaintiff

CAN5fie4

1   going into all of that, they opened the door to what the

2   results of the rape kit were, who she was with that night,

3   her -- how many times she's had sex for money but was Rasheed

4   Davis selling her out; what she did in the club when she was

5   working in the clubs for money, whether it was dancing for

6   lingerie or topless dancing.  She testifies in the deposition

7   about going in VIP rooms.  There were special rooms in the back

8   of these dance clubs.

9           The prejudice that she has laid out regarding

10  Mr. Taylor and the way he acted compared to her experience, you

11  make it sound like she's never done anything like this before,

12  she has never experienced anything like this before.  That is

13  just not a fair and accurate representation of what took place

14  here.  This is a young woman who was working in these bars.

15          THE COURT:  I need to hear from you exactly what it is

16  you want to cross-examine her about.  What do you have to say

17  about the rape kit?  You have raised the issue that there was

18  one and then we never heard anymore about it.  What are you

19  going to argue about it, Ms. Wang?

20          MS. WANG:  Nothing, your Honor.  To be honest, it was

21  more to be clear at some point Mr. Taylor did admit that at

22  some point he changed his story.  That's all.

23          THE COURT:  Are we talking about the rape kit?

24          MS. WANG:  No.  Actually, your Honor, we're not.  So,

25  I don't have any argument on the rape kit.  It was about to

CAN5fie4

1  give context about what happened in that hospital, how she had

2  to talk to so many people, be interviewed so many times, what

3  she went through, but the evidence of the rape kit -- and your

4  Honor I didn't put in, as you noticed and as we now know, I

5  didn't put in a proffer of any of the hospital records

6  precisely to avoid the problem and the fact that the defendants

7  had an objection about what was in there and your Honor's

8  concerns about the notations in there and I didn't put any of

9  that in.  It was to provide context for what was happening to

10 her over the next 20 hours and how many times she was asked

11 questions precisely because defendant is going to spend a lot

12 of time talking about how inconsistent she's been.

13         THE COURT:  All right.  Well, let's leave the rape kit

14 testimony which is already in to one side.

15         You did bring out a lot of stuff on your direct

16 examination about what she did and did not do in terms of going

17 to the clubs, wearing lingerie, dancing with people.  I want to

18 know precisely from you, Mr. Aidala, what questions you are

19 going to ask.  I can't rule if I don't know what the specifics

20 are.

21         MR. AIDALA:  Yes, your Honor.

22         I am going to ask her about the first time she went to

23 the club.  She touched on it that Rasheed gave her some drugs

24 and he put a dress on her in the room.

25         THE COURT:  Yes.  I remember the testimony.

CAN5fie4

1          MR. AIDALA:  So I'm going to explore that area.  I'm

2     then going to explore the other -- she said she did it 12 times

3     is her testimony.  I'm going to explore all the 12 times where

4     did she go?  Who took her there?  How much money did she make?

5     What types of places were these?  What type of people

6     frequented these places?  What time would she get there?  What

7     time would she leave?  Did she take drugs every time she went

8     to dance at these places?  Did she consume alcohol every time?

9          THE COURT:  What else?

10         MR. AIDALA:  Whether Rasheed -- her deposition

11    testimony is that Rasheed -- she got paid money to be with the

12    owner of one of the strip clubs to go to his -- now, she

13    says -- her testimony in the deposition is she was given money

14    to go to the owner of the strip club and she did go to his

15    house but nothing sexual took place so she was basically paid,

16    according to her testimony, just to spend time with a man in

17    his house, the owner of the strip club which I'm going to try

18    to -- she was absolutely incredible but that there was a

19    relationship between her and Rasheed Davis where she was

20    getting money to go spend time with men.  I'm going to ask her

21    if she knows why Rasheed Davis was arrested and why, in her

22    interviews with the FBI, did she tell them that she was getting

23    paid $80 to give oral sex.

24         THE COURT:  Now, you are referring specifically to the

25    complaint, is that right?

CAN5fie4

1          MR. AIDALA:  Yes, your Honor.

2          THE COURT:  And that's an FBI agent's complaint?

3          MR. AIDALA:  Yes, your Honor.

4          THE COURT:  And he is purporting to quote a detective,

5     is that right?

6          MR. AIDALA:  He is quoting a detective; yes, your

7     Honor.

8          THE COURT:  And the detective, according to him, told

9     him about certain statements Ms. Fierro made, is that right?

10          MR. AIDALA:  Yes, your Honor.

11          THE COURT:  Those are the kind of specifics I need.

12     What is it that you want to ask her?  Get the complaint,

13     Mr. Aidala, take a look at it, tell me what you want to ask

14     her.

15          MR. AIDALA:  I have asked for it three times, your

16     Honor.  Sorry.

17          Your Honor, is it appropriate for the witness I'm

18     going to be cross-examining to be here?

19          THE COURT:  Yes.  She's the plaintiff and your client

20     will be here for any period of time and for everything as well,

21     if he wishes.

22          MR. AIDALA:  Okay, your Honor.

23          THE COURT:  Ms. Wang, do you know the document we are

24     looking for?

25          MS. WANG:  I do know it and I believe I only have it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CAN5fie4

1   on computer.  I will see if we have it.

2              MR. AIDALA:  I have located it, your Honor.

3              THE COURT:  Okay.  Great.  Just tell me what the

4   statements are in there that would be the basis for your

5   cross-examination.

6              MR. AIDALA:  Page 3, Bates stamp 00019:  Davis caused

7   victim 1 to engage in multiple commercial sex acts with various

8   individuals.  Davis set the prices for the various commercial

9   sex acts, for example, oral sex generally cost $80, sexual

10  intercourse generally cost $150.

11             For her to come up here I would say that this is the

12  first time that she's ever engaged in any kind of sex for money

13  when the FBI had sworn under oath that that is not the evidence

14  that they've discovered --

15             THE COURT:  No.  The FBI didn't swear anything about

16  evidence.  The FBI said that an agent said a detective told him

17  what, that the defendant --

18             MR. AIDALA:  Basically that she had done this before,

19  that Davis had --

20             THE COURT:  Who is the speaker?  In other words who

21  does the detective say he learned this from?

22             MR. AIDALA:  Based on my conservations with the

23  detective with the New York City Police Department who

24  participated in the interview.

25             THE COURT:  Interview of whom?

CAN5fie4

 1              MR. AIDALA:  Of Ms. Fierro.

 2              THE COURT:  Okay.  And so those statements are

 3     purportedly from Ms. Fierro?

 4              MR. AIDALA:  Yes, your Honor.

 5              THE COURT:  Okay.  Ms. Wang you opened and said that

 6     this was her first time in terms of sex for money and you also

 7     had her specifically testify -- or I should say she

 8     specifically testified to that fact again.

 9              MS. WANG:  Yes, your Honor, although -- and I

10     understood from our conversations on Friday, maybe I

11     misunderstood, but he can cross-examine because he has a

12     good-faith basis to ask that question.

13              THE COURT:  Right.

14              MS. WANG:  But not that an FBI agent said it or that a

15     detective said it, that there is three layers of hearsay and we

16     believe that the officer who is going to come and testify is

17     actually the detective and he can clarify exactly what she

18     said.

19              THE COURT:  All right.  Well, then there is no

20     objection, Mr. Aidala, to your asking the plaintiff whether or

21     not she ever did have sex for money before and if she denies

22     it, which would be consistent with her testimony on direct, you

23     can ask her were you interviewed by a detective?  Do you

24     remember that?  And isn't a fact that you told the detective

25     this?  Isn't it a fact that you told the detective that?  Etc.

CAN5fie4

 1   There appears to be no objection to that.  Okay?

 2           What else?

 3           MR. AIDALA:  Nothing specifically that I would say

 4   would fall under Rule 412.  Her promiscuity is going to be, and

 5   what her occupation was and how she was making money is

 6   definitely going to be part of my cross-examination.  Do I have

 7   anything specific such as the --

 8           THE COURT:  You have got specifics.  You have got the

 9   three statements from the complaint.

10           MR. AIDALA:  Yes, your Honor.

11           THE COURT:  And I'm going to allow you to ask her, as

12   I have mentioned before, where she lived before but nothing

13   about sexual activity.

14           MR. AIDALA:  And did the Court rule about her being

15   with Anthony immediately prior to this and what she was doing?

16           THE COURT:  I'm not permitting that.  I don't think it

17   is relevant.

18           MR. AIDALA:  So I'm not allowed to ask her.

19           THE COURT:  And that was her boyfriend?

20           MS. WANG:  Yes, your Honor.

21           MR. AIDALA:  Your Honor --

22           THE COURT:  You can ask her whether or not it wasn't a

23   fact that even though she said she was with her sister, wasn't

24   she in fact with her boyfriend.  That's fine to impeach her as

25   not being with her sister but I don't want you getting into

CAN5fie4

```
 1   they were having intercourse.

 2          MR. AIDALA:  And that's why she wasn't answering

 3   Rasheed's calls.

 4          THE COURT:  You can ask her wasn't it a fact you

 5   weren't answering the calls because you were with your

 6   boyfriend.

 7          MS. WANG:  Your Honor, just out of an abundance of

 8   caution, I want to make clear I understand with respect to the

 9   FBI statements in that complaint that that is not going to be

10   put into evidence.

11          THE COURT:  No.

12          MS. WANG:  It is just that he is asking --

13          THE COURT:  It is not evidence, it is all hearsay, but

14   it gives Mr. Aidala a good faith basis to ask those questions.

15          MS. WANG:  Absolutely.

16          MR. AIDALA:  And, your Honor, I am going to be

17   speaking about those redacted portions of the text messages

18   that we have spoken about earlier.

19          THE COURT:  You can use those on cross, yes.

20          MR. AIDALA:  Okay, your Honor.  Just to be clear, he

21   refers -- Rasheed Davis is referring to her spending time with,

22   I think it is a bum.  That's Anthony.  So I don't believe it is

23   going to come out if there is anything about sex but I would

24   just want to make sure I read through to make sure that I am

25   right.
```

CAN5fie4

1            MS. WANG:  Your Honor, I would, given the way that the

2    testimony has come out at this point, I would object to the use

3    of those first -- in particular have one concern that

4    Mr. Aidala is going to try to bring up her prior use of drugs

5    and I just want to explore that and make sure that he is not

6    going to go into every time she has ever used drugs because I

7    don't think that's relevant.  The fact that she was given

8    ecstasy for dancing and the fact that Rasheed gave her ecstasy

9    is certainly in play and certainly he can ask questions about

10   that.

11           THE COURT:  He is permitted to ask questions about it.

12           MS. WANG:  Okay.

13           THE COURT:  And there was testimony elicited that she

14   did it about 12 times, I guess.

15           MS. WANG:  Yes, but I did want to just say, I want it

16   to be clear that my understanding is he has not been asked

17   about any other times outside of the use of Rasheed if she did

18   or did not use drugs any other times.

19           THE COURT:  Well, I don't know.  Are you?

20           MR. AIDALA:  Yes, your Honor.  In her deposition she

21   said she used ecstasy at the age of 14 and that Rasheed gave it

22   to her.

23           THE COURT:  Mr. Aidala, I don't have any doubt that

24   what you are saying was said in the deposition.  Okay?  I

25   accept that from you.  But if you want to get in drug use that

CAN5fie4

1   has nothing to do with what has been brought out on direct,

2   give me a memo of law and tell me why it is relevant.  Okay?

3   And you can fax it in or e-mail it to us tonight.

4           MR. AIDALA:  Your Honor, may I proffer what I was

5   about to just say just so you could hear?

6           THE COURT:  Sure.

7           MR. AIDALA:  The testimony is he gave her more than

8   her limit or something along those lines.  I need to gauge what

9   is her limit of ecstasy.  She has a limit to ecstasy that it is

10  inferring that she's done it before.  So, if he gave her more

11  than she's used to taking then how does she know what she is

12  used to taking?  I'm not looking to -- I'm just trying to put

13  it in context about her use of ecstasy, that it wasn't the

14  first time she had ecstasy was Rasheed Davis giving it to her.

15          THE COURT:  Fair enough.  I understand where you are

16  going.  I will allow it, permit you to get into that.

17  Ms. Wang, you can object when you believe it is not relevant

18  any longer to the facts on this case and I will decide it on a

19  question by question basis.

20          What else?

21          MR. AIDALA:  Off the top of my head I believe that is

22  it.

23          THE COURT:  Okay.  All right.

24          MR. AIDALA:  It has been a long day.  I'm sorry, I

25  kid.

CAN5fie4

```
 1              THE COURT:  Then I will see everybody at -- it is hard
 2    to get into this building sometimes with the line so maybe all
 3    of you could shoot for 9:15 as well.  In addition, if you are
 4    going to be showing photos, we need this equipment to work.
 5              MS. WANG:  Yes.
 6              THE COURT:  I think we made the court house person who
 7    handles this, our audiovisual person, available.  Do you want
 8    him again?  We will try do this or can you fix this yourselves?
 9    I don't want to take up the time with people handing exhibits
10    around when they can take a look at it on their individual
11    screens.
12              I'm told Shawn will be here at 9:00; that means
13    someone from your team, Ms. Wang, has to be here at 9:00 to
14    meet him.
15              MS. WANG:  Absolutely.  Thank you, your Honor.
16              THE COURT:  Do you have any exhibits that you will be
17    using, gentlemen?
18              MR. MANNARINO:  Your Honor, in light of the fact that
19    plaintiff offered the surveillance video we would also like to
20    show the surveillance video as well.
21              THE COURT:  It is in evidence.  You can do whatever
22    you want.
23              MR. MANNARINO:  The point is then I guess we will be
24    here to meet with Shawn as well to set up our computers to have
25    it work properly.
```

CAN5fie4

```
 1              THE COURT:  It is really important that once the jury

 2    sits down in the box we have everything ready to go.  All

 3    right?

 4              MR. AIDALA:  Your Honor, your ruling regarding the

 5    rape test kit is --

 6              THE COURT:  I think something has to be said about

 7    that because there can't be a rape kit test hanging out there

 8    with no explanation of what a rape kit is or what the point of

 9    it is.  Why don't you think on that, Ms. Wang and Mr. Aidala,

10    and maybe you will come to a stipulation so that it is not

11    going to confuse the jury or have them start speculating.  All

12    right?

13              MR. AIDALA:  Thank you very much, Judge.

14              THE COURT:  Okay.  I will see everybody in the

15    morning.

16              (Adjourned to 9:15 a.m., Wednesday, October 24, 2012.)

17

18

19

20

21

22

23

24

25
```

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    CRISTINA FIERRO

4    Direct By Ms. Wang . . . . . . . . . . . . . .51

5                        PLAINTIFF EXHIBITS

6    Exhibit No.                              Received

7    1   . . . . . . . . . . . . . . . 57

8    2   . . . . . . . . . . . . . . . 71

9    3   . . . . . . . . . . . . . . . 80

10   4   . . . . . . . . . . . . . . . 81

11   5   . . . . . . . . . . . . . . . .107

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```